UNITED STATES of America, Appellee,

v.

Oscar ROLDAN–ZAPATA and Pedro Osario–Serna,
Defendants–Appellants.

Nos. 707, 708, Dockets 89–1384, 1385.

United States Court of Appeals,
Second Circuit.

Argued March 2, 1990.

Decided Oct. 4, 1990.

Anthony J. Scremin, Miami, Fla., for appellant Roldan–Zapata.

Michael M. Maloney, New York City, for appellant Osario–Serna.

Rona M. Wittels, Asst. U.S. Atty., Brooklyn, N.Y. (Andrew J. Maloney, U.S. Atty., E.D.N.Y., Matthew E. Fishbein, Emily Berger, Asst. U.S. Attys., of counsel), for appellee.

Before OAKES, Chief Judge, KEARSE and WALKER, Circuit Judges.

WALKER, Circuit Judge:

Following a jury trial before the late Judge Mark A. Costantino in the Eastern District of New York, defendants Oscar Roldan–Zapata and Pedro Osario–Serna were convicted of conspiracy to distribute and possess with intent to distribute in excess of five kilograms of cocaine, in violation of 21 U.S.C. §§ 846, 841(a)(1). Osario–Serna was also convicted of possession with intent to distribute in excess of five kilograms of cocaine, in violation of 21 U.S.C. § 841(a)(1). For the reasons given below, the convictions are affirmed in all respects.

## BACKGROUND

The evidence at trial centered around the activities in Queens, New York, on March 10, 1988, of appellants Roldan–Zapata and Osario–Serna, and Eric Akiva, a co-defen-

dant who pleaded guilty and testified for the government, that culminated in the delivery to Akiva of a box containing ten kilograms of cocaine. In addition to Akiva's testimony, the government presented the substance of its case through surveillance agents of the New York Drug Enforcement Task Force ("Task Force"), who testified to observing a series of clandestine meetings and telephone calls by the defendants.

On or about March 8, 1988, Akiva, seeking cocaine on behalf of a Miami dealer, contacted Osario–Serna by beeper page to arrange for Osario–Serna to deliver a package of cocaine. They agreed to meet on March 10 at a diner in Queens. On March 9, Roldan–Zapata flew from Miami to New York, staying that evening with Osario–Serna.

At noon on March 10, Roldan–Zapata and Osario–Serna, under surveillance, left the latter's home in Queens in a tan Oldsmobile. The car made a series of brief stops where one or the other or both used a public telephone. After stopping briefly at a bakery and spending an hour at a restaurant, the two drove to a diner on Astoria Boulevard. Surveillance agents observed both men enter the diner and leave it, at various times, to use the public telephones in the parking lot. While Roldan–Zapata and Osario–Serna were seated in the diner, Akiva arrived. Roldan–Zapata then left the diner, whereupon Akiva asked Osario–Serna about Roldan–Zapata, whom he had never met before. Osario–Serna responded that Roldan–Zapata was "El Jefe," meaning "the boss." While Akiva and Osario–Serna spoke inside, Roldan–Zapata sat in the car reading a newspaper and made phone calls from a public telephone in the parking lot.

Osario–Serna then told Akiva that it was time to "get the package." Akiva left the parking lot in a black Nissan Maxima followed shortly thereafter by Roldan–Zapata and Osario–Serna in the tan Oldsmobile, which soon took the lead. After the Oldsmobile drove into and out of LaGuardia Airport without stopping, the caravan proceeded to a Burger King on Northern Boulevard. Roldan–Zapata and Osario–Serna then met with an unidentified man in the parking lot. All three went inside, where they were joined by a balding man wearing a brown leather jacket, referred to at trial as "John Doe Leather Jacket." Osario–Serna then met with Akiva, and instructed him to get his car ready to go. While this conversation was going on, Roldan–Zapata used a pay phone in the parking lot.

Osario–Serna and Akiva left the Burger King and drove out of the lot in Akiva's Maxima. They drove around the corner, where they were met by a burgundy Oldsmobile. The driver of the Oldsmobile was John Doe Leather Jacket, who removed a cardboard carton from the trunk and placed it in the rear seat of Akiva's car. Osario–Serna adjusted the package and instructed Akiva to leave, saying "go, go, go, I'll call you," and then walked away. Akiva drove off alone. John Doe Leather Jacket then drove the burgundy Oldsmobile into the Burger King parking lot. Roldan–Zapata left the public telephone he was using, walked to the car, and spoke with John Doe Leather Jacket. After a few seconds of conversation, Roldan–Zapata waved to the driver, who drove the burgundy Oldsmobile away from the area.

Soon thereafter, agents arrested Akiva while driving the Maxima on the Long Island Expressway. On the rear seat, a detective found an open brown box containing ten kilograms of cocaine. Osario–Serna and Roldan–Zapata were arrested in the tan Oldsmobile on the Whitestone Expressway. The burgundy Oldsmobile was not located. Detectives seized from Osario–Serna a number of items, including a beeper and a registration for the tan Oldsmobile in the name of another person. From Roldan–Zapata they seized various papers, including a receipt for maintenance of a swimming pool with writing on the back, two receipts for beepers dated March 10, 1988, and an airline ticket from Miami to New York in the name of Oscar Roldan.

Thereafter, Osario–Serna gave oral and written consent to a search of his apartment in Queens. Agents recovered a .38 caliber snub-nose revolver and a number of

shoeboxes with pieces of tape on top, including two empty shoeboxes, one with the number "40" and the other with "46" written on the tape. The agents also found a brown ledger, a red memo book, and several papers contained in a card folder, including a Social Security card, Florida driver's license, and resident alien registration card in the name of Oscar Roldan, and a small piece of paper with names and numbers written on it.

After being advised of his *Miranda* rights, Osario–Serna spoke to a detective about his *modus operandi* as a drug dealer. He stated that he would receive a phone call from Miami telling him to contact a buyer in New York to arrange a drug transaction. Osario–Serna would then "beep" that person, who would call him back and tell him where to meet to complete the deal. Osario–Serna also stated that the "stash" house was located in Great Neck, Long Island.

Akiva and Roldan–Zapata were placed in the Metropolitan Correctional Center ("MCC") in Manhattan. Roldan–Zapata told Akiva that he could see that Akiva was a family man, that he would try to help Akiva obtain a lawyer, and that the government had no case against them if Akiva did not talk.

In addition to Akiva and the various law enforcement agents who testified at trial to the above facts, Jose Guzman, a federal Drug Enforcement Agency intelligence officer and a former New York City Police Department Detective and Task Force member, testified as an expert witness on drug trafficking techniques. Guzman explained that narcotics dealers commonly use beepers and move "from pay phone to pay phone" to arrange transactions and avoid detection by the authorities. He also testified that on many occasions he had seen shoe boxes used by drug dealers to carry currency. He stated that he believed that the shoeboxes found in Osario–Serna's home had contained profits from narcotics trafficking and that the numbers written on the top referred to the amount of money in each box, in thousands of dollars. Guz-

man also testified that guns were tools of the drug trade.

Guzman identified the brown ledger seized from Osario–Serna's home as a running account of a narcotics "stash house." The book contained entries for money coming in from listed narcotics customers and money going out, either as loans to dealers or expenses such as beepers and utilities. Guzman testified that the writing on the back of the swimming pool receipt taken from Roldan–Zapata reflected a running account of money coming in, with an end figure of $210,400. Guzman stated that the small piece of paper found among Roldan–Zapata's identification documents in Osario–Serna's apartment was also a running account of money, totalling $137,000. Written in Spanish across the top of this paper were abbreviations for "cash money," "amount," "month" and "day."

Each defendant presented evidence. Roldan–Zapata, through his own testimony and that of four other witnesses, claimed that he was an innocent bystander engaged in legitimate business when the drug transactions took place. He testified that he had a computer company in Florida that provided insurance billing systems to doctors, and that he came to New York to visit his brother-in-law, a physician, and discuss the business. When an unexpected change in his brother-in-law's work schedule prevented their meeting, Roldan–Zapata made last-minute arrangements to stay with Osario–Serna, whom he knew from Miami but had not seen recently.

According to Roldan–Zapata, although he spent March 10 driving around with Osario–Serna, he did not speak about any drug transaction and had no idea that one was taking place. He said he used a pay phone first to call his wife in Miami, who informed him of a problem in the office that required his immediate return, and then to call his office and change his travel plans. He said he used the phone later at the Burger King to try to call his wife to have her pick him up at the Miami airport. He said Osario–Serna drove into LaGuardia Airport for the purpose of dropping him off for his return flight, but he refused to get

out because he did not want to wait for three hours and did not want to make Osario–Serna's pregnant wife bring his luggage later.

Roldan–Zapata denied ever having the conversation with Akiva at the MCC regarding the case. A witness testified that he had given Roldan–Zapata the pool service bill when Roldan–Zapata needed paper on which to write something during a phone call to Colombia. Roldan–Zapata also called his own expert witness, who testified that the writing on the pool service bill, the brown ledger and the other papers were not narcotics records. The expert also testified that drug dealers primarily use mobile phones rather than public telephones, and that legitimate businessmen also use beepers and pay telephones.

Osario–Serna's common-law wife testified that her husband sold beepers and mobile phones for a living. She testified that the brown ledger book included a record of beeper transactions and an account of household expenses and her sale of crystal figurines, nail enamel and nail files. She stated that one of the ledgers was merely a record of a card game she and her husband had played. She claimed that the "40" and "46" written on pieces of tape on the shoeboxes simply represented Colombian shoe sizes.

The jury found both Roldan–Zapata and Osario–Serna guilty of conspiracy to distribute and possess with intent to distribute cocaine, and Osario–Serna guilty of possession with intent to distribute cocaine. The district court sentenced Roldan–Zapata to 155 months imprisonment, three years of supervised release, and a $50 special assessment, and Osario–Serna to 121 months imprisonment, five years of supervised release, and a $100 special assessment.

## DISCUSSION

On appeal, Roldan–Zapata contends that Judge Costantino improperly refused to recuse himself on the basis of disparaging comments about Colombians he made in another case. Roldan–Zapata also claims that he was denied a fair trial by the court's improper evidentiary rulings, in-

cluding the admission of supposed hearsay testimony by Eric Akiva, and restrictions on defense counsel's examination of certain witnesses, and by the court's supposed display of prejudice and hostility towards his attorney. He also alleges prosecutorial misconduct, based in part on the asserted failure of the government to turn over a copy of Akiva's plea agreement and transcripts of Akiva's debriefing, and allegedly improper comments in the prosecutor's summation. Osario–Serna also objects to the supposed hearsay, and to the admission of Akiva's testimony regarding his previous cocaine transactions and Agent Guzman's expert testimony regarding the items found in his apartment. Each defendant also challenges the legal sufficiency of the evidence supporting the convictions.

### I. *Motion for Recusal*

■ Roldan–Zapata asserts that Judge Costantino should have recused himself on the basis of disparaging comments about Colombians he made during sentencing in another case and that the judge's "bias and prejudice against Colombians," or the appearance thereof, deprived him of a fair trial.

At the October 11, 1988, sentencing of Luis Edwardo–Franco and Rocio Gallego for drug conspiracy, in response to counsel's argument in mitigation that the defendants were not a danger to the community and were subject to deportation, Judge Costantino stated:

> They [Colombians] don't have too much regard for Judges. They only killed 32 Chief Judges in that nation. Their regard for the judicial system, the men who run their laws, I'm glad I'm in America. That's why I pledge allegiance to the flag. My mother and father came from Italy.
>
> \* \* \* \* \* \*
>
> [T]hey should have stayed where they were. Nobody told them to come here. I'm one of the fellows who makes United States citizens. Nobody tells them to come and get involved in cocaine. Don't give me that theory. My father came

over with $3 in his pocket. He has a Federal Judge as a son.

Based in part on these comments, we granted the defendants a new trial. *See United States v. Edwardo–Franco*, 885 F.2d 1002, 1005–10 (2d Cir.1989).

In this case, however, recusal was not required. Roldan–Zapata does not and cannot point to one place in the record in this case where Judge Costantino expressed any bias or prejudice against Colombians. Moreover, in holding that Judge Costantino did not maintain the requisite appearance of impartiality in the earlier case, we explicitly stated that "[o]ur conclusion in this regard should not be interpreted to mean that the district judge in fact was guilty of such prejudice." *Id.* at 1005–06. A judge's inappropriate comments in one case do not necessarily preclude his fairly presiding over other trials. Indeed, this court in *Edwardo–Franco* never suggested that Judge Costantino's remarks would prevent his presiding over the retrial in that case, let alone unrelated cases involving different defendants. Finally, it is irrelevant that Roldan–Zapata's counsel was also trial counsel in *Edwardo–Franco*, and that Roldan–Zapata happened to be in the courtroom at the *Edwardo–Franco* sentencing.

"Discretion is confided in the district judge in the first instance to determine whether to disqualify himself." *In re Drexel Burham Lambert, Inc.*, 861 F.2d 1307, 1312 (2d .Cir.1988), *cert. denied*, — U.S. —, 109 S.Ct. 2458, 104 L.Ed.2d 1012 (1989). We find that Judge Costantino did not abuse his discretion in failing to recuse himself in this case. Moreover, Roldan–Zapata's claim that the court failed to exercise its discretion at all in deciding the recusal motion has already been decided against him. *See In re Roldan–Zapata*, 872 F.2d 18, 19 (2d Cir.1989) (per curiam).

## II. *Sufficiency of the Evidence*

Each defendant challenges the legal sufficiency of the evidence supporting his conviction. However, a conviction must be upheld if, " 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found

the essential elements of the crime beyond a reasonable doubt.' " *United States v. Resto*, 824 F.2d 210, 212 (2d Cir.1987) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)). The jury is entitled to base its verdict upon inferences from circumstantial evidence, *see United States v. Mariani*, 725 F.2d 862, 865–66 (2d Cir.1984), and such evidence " 'need not have excluded every possible hypothesis of innocence.' " *United States v. Tyler*, 758 F.2d 66, 68 (2d Cir. 1985) (quoting *United States v. Soto*, 716 F.2d 989, 993 (2d Cir.1983)). Moreover, " 'once a conspiracy is shown, only slight evidence is needed to link another defendant with it.' " *United States v. Vanwort*, 887 F.2d 375, 386 (2d Cir.1989) (quoting *United States v. Wilkinson*, 754 F.2d 1427, 1436 (2d Cir.) (quoting *United States v. Marrapese*, 486 F.2d 918, 921 (2d Cir.1973), *cert. denied*, 415 U.S. 994, 94 S.Ct. 1597, 39 L.Ed.2d 891 (1974)), *cert. denied*, 472 U.S. 1019, 105 S.Ct. 3482, 87 L.Ed.2d 617 (1985)), *cert. denied*, — U.S. —, 110 S.Ct. 1927, 109 L.Ed.2d 290 (1990).

Viewing the evidence in the light most favorable to the government, *see, e.g., Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), and drawing all reasonable inferences and resolving all issues of credibility in favor of the jury's verdict, *see, e.g., United States v. Bagaric*, 706 F.2d 42, 64 (2d Cir.), *cert. denied*, 464 U.S. 840, 104 S.Ct. 134, 78 L.Ed.2d 128 (1983); *United States v. Khan*, 787 F.2d 28, 33–34 (2d Cir.1986), we have no trouble concluding that the evidence was sufficient.

The evidence of Roldan–Zapata's participation in the conspiracy included Osario–Serna's description of Roldan–Zapata as "El Jefe"—the boss—from Florida, permitting the inference that Roldan–Zapata was a drug trafficker who flew to New York to supervise the cocaine transaction. This inference was buttressed by his close association on March 10 with Osario–Serna, his remaining in the diner long enough to observe the buyer, his following circuitous routes by car and use of various pay telephones, and his parting conversation with

John Doe Leather Jacket after the latter had just delivered the cocaine.

Further corroboration was provided by physical evidence seized after the arrests, including, on Roldan–Zapata's person, beeper receipts dated March 10, 1988 and a running account of narcotics transactions and, among his identification papers in Osario–Serna's apartment, another running account. Finally, Roldan–Zapata's statements at the MCC offering to help Akiva obtain a lawyer and explaining that the government had no case against them if Akiva did not talk were probative of his consciousness of guilt.

Thus the government's evidence standing alone was easily sufficient to support Roldan–Zapata's conviction. Moreover, Roldan–Zapata, through his own and others' testimony, provided an innocent explanation for his activities that the jury rejected. By taking the stand and offering his own version of events, he " 'waive[d] any claim as to the sufficiency of the Government's case considered alone.' " *United States v. Tyler,* 758 F.2d 66, 69 (2d Cir.1985) (citations omitted). The jury clearly disbelieved Roldan–Zapata's account, and the jury is entitled to use a defendant's testimony to reach contrary conclusions. *See United States v. Panza,* 750 F.2d 1141, 1150 (2d Cir.1984); *United States v. Singleton,* 532 F.2d 199, 204 (2d Cir.1976). Roldan–Zapata's implausible and contradictory account of his activities only buttressed the government's case against him.

█ The evidence against Osario–Serna was even stronger. Not only did he admit after his arrest to his involvement in narcotics dealing and to a pattern of trafficking consistent with this case, but Akiva was a direct witness against him as to most of the March 10 events. Circumstantial evidence of Osario–Serna's involvement in the drug transaction included his circuitous travels and use of pay phones, his numerous meetings, including one with the man who delivered the cocaine, and the physical evidence found in his apartment. Osario–Serna's reliance on cases stating that mere association with drug traffickers is insufficient to support an inference of guilt, *see,*

*e.g., United States v. Soto,* 716 F.2d 989 (2d Cir.1983), is unavailing. The evidence here of his involvement goes far beyond mere association; it establishes his knowing participation.

### III. *Challenged Rulings and Actions of the District Court*

#### A. *Alleged Hearsay Testimony by Akiva*

Both defendants challenge as inadmissible hearsay two statements allegedly made by them to which Akiva testified: Osario–Serna's comment at the diner that Roldan–Zapata was "El Jefe" and Roldan–Zapata's statement to Akiva at the MCC that he would help Akiva obtain a lawyer and the government had no case against them if Akiva kept silent. Both were properly admitted.

█ Osario–Serna's reference to Roldan–Zapata as "El Jefe" was both relevant to disputed factual issues and admissible against each defendant as nonhearsay under Fed.R.Evid. 801(d)(2)(A) and (E)— against Osario–Serna as the statement of a party and against Roldan–Zapata as "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." The statement furthered the conspiracy's purposes by informing Akiva of the identity and role of Roldan–Zapata and reassuring him to proceed with the transaction in the presence of someone with whom he was not familiar. *See United States v. Rastelli,* 870 F.2d 822, 837 (2d Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 515, 107 L.Ed.2d 516 (1989); *United States v. Rahme,* 813 F.2d 31, 36–37 (2d Cir.1987). It was probative of defendants' roles in the conspiracy and of Osario–Serna's knowledge. Further, its admission caused no unfair prejudice.

█ Roldan–Zapata's statements to Akiva at the MCC were also admissible against both defendants. Roldan–Zapata's offer to get a lawyer for Akiva is probative of their joint endeavor and his leadership role. His statement that the government would have no case if Akiva did not talk is an apparent attempt to suppress evidence

of the crime and is plainly relevant to show Roldan–Zapata's consciousness of guilt. *See United States v. Adegbite,* 877 F.2d 174, 180 (2d Cir.), *cert. denied,* — U.S. ——, 110 S.Ct. 370, 107 L.Ed.2d 356 (1989). Roldan–Zapata's claims that he never actually made the latter statement, or that he never actually got the attorney, were for the jury to weigh and do not affect admissibility. The statements were admissible against Roldan–Zapata as statements of a party and against Osario–Serna as statements of a co-conspirator. *See* Rule 801(d)(2)(A) & (E). The jury could infer that they were in furtherance of the common objective of preventing the convictions of both defendants. Co-conspirator statements may include attempts to cover up an ongoing conspiracy after the participants have been arrested. *See United States v. Arrington,* 867 F.2d 122, 130 (2d Cir.1989).

**B. Evidence of Osario–Serna's Previous Cocaine Transactions**

■ Akiva testified to his previous cocaine transactions with Osario–Serna, which the defendant challenges as inadmissible evidence of uncharged prior similar acts. Akiva testified that to help pay off a debt to his dealer in Miami, he had twice agreed to deliver packages of cocaine received from Osario–Serna and was to receive an additional credit for delivering the cocaine received on March 10. Akiva also described one of the prior drug deals where both he and Osario–Serna were present. Osario–Serna claims that this evidence was impermissibly elicited for the purpose of showing his propensity to commit such crimes, in violation of Fed.R.Evid. 404(b), and, further, that its probative value was outweighed by the danger of unfair prejudice in violation of Rule 403. We reject both claims.

Rule 404(b) allows evidence of other crimes, wrongs, or acts to be admitted for purposes other than showing a propensity to act in a certain manner, such as "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Under the "inclusionary" approach to the rule followed by this circuit, such evidence "is admissible for any purpose other than to show a defendant's criminal propensity." *United States v. Harris,* 733 F.2d 994, 1006 (2d Cir.1984).

Here, the prior act evidence was admissible "to inform the jury of the background of the conspiracy charged," *id.,* "to complete the story of the crimes charged," *United States v. Brennan,* 798 F.2d 581, 589 (2d Cir.1986), *cert. denied,* — U.S. ——, 109 S.Ct. 1750, 104 L.Ed.2d 187 (1989), and to "help[ ] explain to the jury how the illegal relationship between [participants in the crime] developed," *id.* at 590. The pre-existing drug-trafficking relationship between Akiva and Osario–Serna furthered the jury's understanding of how the instant transaction came about and their role in it. This evidence, which represented only a tiny fraction of the testimony heard by the jury, and did not involve conduct any more sensational or disturbing than the crimes with which Osario–Serna was charged, *see United States v. Siegel,* 717 F.2d 9, 16–17 (2d Cir.1983), did not unfairly prejudice Osario–Serna so as to warrant exclusion under Rule 403.

**C. Guzman's Testimony Regarding Items in the Apartment**

■ Osario–Serna also objects to Agent Guzman's expert testimony regarding the drug-related nature of the shoe boxes, ledger book, revolver, and other items seized from the defendant's apartment. He claims that Guzman was not qualified as an expert, and that his testimony constituted improper other act evidence under Fed.R.Evid. 404(b). Both grounds are without merit.

Agent Guzman was properly allowed to testify as a fully qualified expert on narcotics trafficking. As a DEA Intelligence Research Specialist assigned to the New York area, his job included acquiring information about narcotics operations. As a veteran New York City Police detective, he spent sixteen years assigned to the Drug Enforcement Task Force. During his career he participated in thousands of narcotics investigations, frequently undercover, and

testified as an expert in hundreds of cases. Agent Guzman was qualified to testify regarding the narcotics-related nature of the items found in Osario–Serna's apartment, as well as drug trafficking techniques generally, both proper subjects for expert testimony. *See United States v. Diaz,* 878 F.2d 608, 616–18 (2d Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 543, 107 L.Ed.2d 540 (1989).

■ Agent Guzman's testimony about the items seized from Osario–Serna's apartment was also proper under Fed.R.Evid. 404(b) as relevant to issues in this case. Even though the narcotics records and other paraphernalia found in Osario–Serna's apartment might have related to other uncharged offenses, and may not have been specifically used for the March 10 transaction, the jury could infer by their presence that they were tools of the trade in current use. Evidence of their possession at a closely related time is relevant to the charged conspiracy and not a mere showing of bad character, even if it relates to transactions outside the scope of the indictment. *See United States v. Carson,* 702 F.2d 351, 368 (2d Cir.), *cert. denied,* 462 U.S. 1108, 103 S.Ct. 2456, 2457, 77 L.Ed.2d 1335 (1983). The evidence is also probative of Osario–Serna's intent and state of mind to engage in the narcotics trafficking that was charged. *See United States v. Bermudez,* 526 F.2d 89, 96 (2d Cir.1975), *cert. denied,* 425 U.S. 970, 96 S.Ct. 2166, 48 L.Ed.2d 793 (1976).

The rest of Osario–Serna's objections to the items found in the apartment are easily rejected. The government's alleged failure to show that Osario–Serna was in exclusive possession of the apartment is immaterial. It was not disputed that he lived there. Further, he consented to the search and has never subsequently objected to it. His argument that the existence of drug-related items in the apartment did not tend to prove his use or control of them goes to the weight of the evidence, not its admissibility. Finally, the probative value of such evidence was not outweighed by a danger of unfair prejudice.

**D. Restrictions on Garcia's Expert Testimony**

■ Roldan–Zapata asserts that the trial court unfairly limited his direct examination of defense expert witness Ralph Garcia regarding "police and DEA agents' procedures involving record keeping and surveillance on drug cases." Detective Mistretta had testified that he saw Roldan–Zapata go to the burgundy Oldsmobile and speak with and gesture to John Doe Leather Jacket, who had just delivered the cocaine to Akiva, but he never documented this observation in a report. Roldan–Zapata wanted Garcia to testify to the effect that "observations made during surveillance are normally documented in a report," to attack Mistretta's credibility and to cast doubt on whether the event occurred.

The district court acted within its discretion in preventing Garcia from testifying as to the "normal" procedure of documenting surveillance observations. Fed.R.Evid. 702 allows a witness qualified as an expert by knowledge or experience to testify regarding his specialized area of knowledge if such testimony will be helpful to the trier of fact. A trial judge has broad discretion in applying the rule, and his actions will be sustained unless "manifestly erroneous." *United States v. Diaz,* 878 F.2d at 616 (quoting *United States v. Everett,* 825 F.2d 658, 662 (2d Cir.1987), *cert. denied,* 484 U.S. 1069, 108 S.Ct. 1035, 98 L.Ed.2d 999 (1988)).

Roldan–Zapata offered Garcia as an expert "relative to drug cases, drug paraphernalia, and things of that nature." Garcia was clearly qualified to testify, and did so, as to whether the notes and ledgers taken from defendants were narcotics records and whether only drug dealers use beepers and pay telephones. However, Garcia's competence to testify as to the then-current recordkeeping procedures of the law enforcement agencies involved, or whether there should have been a written report memorializing Mistretta's observation, was not established. A witness may be qualified as an expert on certain matters and not others. *See United States v. Pugliese,* 712 F.2d 1574, 1581–82 (2d Cir.1983).

Garcia had been a Washington, D.C. police officer for three and one-half years and a DEA agent for eight years, but had never been permanently assigned to the New York area and had retired from government service in 1979, eight years before the events at issue. In this light, the district court's exclusion of the proffered testimony as to "normal" procedures was not manifest error.

■ Furthermore, Garcia's testimony on this score was excludable as cumulative. See Fed.R.Evid. 403; *United States v. Cruz*, 797 F.2d 90, 96 (2d Cir.1986); *United States v. Jamil*, 707 F.2d 638, 643 (2d Cir. 1983). Defense counsel extensively questioned Detective Mistretta about the observations at issue and emphasized the absence of such observations from any report. Further, "expert" testimony was not necessary to assist the jury which had before it all of the relevant means to assess the credibility of the witness.

■ Similarly, the district court did not err in prohibiting Garcia from testifying as to the "usual" government practice of recording the debriefing of a cooperating witnesses. Akiva testified to certain incidents implicating Roldan–Zapata in the conspiracy, including Osario–Serna's "El Jefe" comment and the statements in the MCC, but the government failed to provide any written statements of Akiva reflecting these incidents. The district court acted within its discretion in excluding Garcia's proposed testimony, in light of Garcia's questionable expertise on this score, and the fact that such testimony was rendered largely cumulative by Akiva's statement on cross-examination that he thought some notes were taken of his debriefing.

### E. Restrictions on Examination of Mistretta

Roldan–Zapata asserts that the district court unfairly restricted his examination of Detective Mistretta regarding two documents said to reveal prior inconsistent statements by Mistretta related to his testimony regarding Roldan–Zapata's conversation with John Doe Leather Jacket in the Burger King parking lot. The court prevented counsel from (1) impeaching Mistretta with purported inaccuracies—involving the relative placement of the pay phones and the Oldsmobile—in the report of Detective Mulcahy, to whom Mistretta had given information, and (2) exploring the allegations in the criminal complaint, based in part on information provided by Mistretta, concerning the existence of a third person at the conversation. Although we find these rulings problematic,[1] in neither instance did the district court's restriction on examination so undermine the defendant's right to confront adverse witnesses as to create reversible error.

■ As long as a defendant's right to confront the witnesses against him is not violated, limitations on cross-examination are not grounds for reversal. See *Delaware v. Van Arsdall*, 475 U.S. 673, 678–79, 106 S.Ct. 1431, 1434–35, 89 L.Ed.2d 674 (1986).[2] Cross-examination is not improperly curtailed if the jury is in possession of facts sufficient to make a "discriminating appraisal" of the particular witness's credibility. See *United States v. Singh*, 628 F.2d 758, 763 (2d Cir.), cert. denied, 449 U.S. 1034, 101 S.Ct. 609, 66 L.Ed.2d 496 (1980). In this case, the extensive cross-examination of Detective Mistretta about his description of Roldan–Zapata's meeting with John Doe Leather Jacket after the cocaine transfer adequately apprised the jury of information enabling them to make a discerning appraisal of Mistretta's credibility on this matter. Accordingly, there was no violation of Roldan–Zapata's sixth amendment rights.

1. Mistretta was as capable as Mulcahy to testify regarding the statements he made to Mulcahy before she prepared the report. Even if Roldan–Zapata intended for Mistretta to testify simply to the contents of the report, as Mistretta was a source for the report, statements contained therein were at least probative of Mistretta's statements to Mulcahy. Similarly, the criminal complaint, based in part on information provided by Mistretta, was probative of a prior inconsistent statement by Mistretta.

2. Defense counsel's proposed direct examination of Mistretta as to the complaint was the functional equivalent of cross-examination.

## F. Court's Alleged Disparagement of Counsel

 Roldan–Zapata also claims that the district court "erred by consistently making derogatory statements and demeaning counsel for the defendant in front of the jury[,] ... [thereby] unmistakably convey[ing] to the jury the trial judge[']s prejudicial opinion that the defendant was guilty." We disagree.

A fair reading of the record reveals that the judge's comments in front of the jury, even if at times stern or sarcastic, were appropriate responses to counsel's improper questioning of witnesses, inappropriate requests and disrespectful gestures. Moreover, such rebukes of counsel were not likely to cause a juror to feel that the judge believed Roldan–Zapata to be guilty. Finally, other comments by the judge in the absence of the jury, even if unwarranted, furnish no basis for reversal. *See United States v. DiTommaso*, 817 F.2d 201, 221 (2d Cir.1987).

## IV. *Alleged Prosecutorial Misconduct*

 Finally, Roldan–Zapata asserts that prosecutorial misconduct denied him a fair trial. He alleges that the prosecutor failed to provide his counsel with a copy of Akiva's plea agreement or transcripts of any debriefing of Akiva. Roldan–Zapata also contends that the prosecutor made improper comments in her summation. These claims are without merit.

Akiva's plea agreement was intended to be part of the Jencks Act material provided to the defense before trial. Although the document apparently was missing from the materials provided to Roldan–Zapata, he never called for its production or made the government aware of its absence, even after Akiva testified about the agreement on direct examination. There was no governmental misconduct since there was no evidence that the prosecution intentionally withheld Akiva's plea agreement from Roldan–Zapata's materials. Similarly, there was no misconduct in the prosecution's failure to produce transcripts of Akiva's debriefing. Roldan–Zapata never sought their production. The prosecution claims that it is unaware of any debriefing notes, and there is no evidence suggesting that it willfully withheld them. A prosecutor is not required to turn over material that he neither possesses nor knows about. *Morgan v. Salamack*, 735 F.2d 354, 358–59 (2d Cir.1984).

Roldan–Zapata's claim that comments made by the prosecutor during summation improperly hinted at evidence outside the record is simply wrong. Referring to Roldan–Zapata's actions on March 10, the prosecutor stated:

> He was El Jefe. He was the chief, he was supervising his investment and those phone calls, I submit, they were making all that morning were to set up the transfer of this ten kilos.

> \* \* \* \* \* \*

> Mr. Pedro had this red book, Government's Exhibit 32 with plenty of numbers in, who is to say they were calling people in New York. For all we know they were calling Miami to arrange a deal.

These remarks were supported by evidence in the record.

 In summation counsel are free to make arguments which may be reasonably inferred from the evidence presented. *See United States v. Suarez*, 588 F.2d 352, 354 (2d Cir.1978); *United States v. Dibrizzi*, 393 F.2d 642, 646 (2d Cir.1968). Osario–Serna's reference to Roldan–Zapata as "El Jefe," coupled with the other evidence of the day's activities and the physical evidence seized after their arrest, amply support the prosecutor's comments on Roldan–Zapata's role in transaction and the nature of the phone calls. While there was no direct evidence that the calls might have been to Miami to arrange another deal, the ample evidence demonstrating that defendants were major narcotics traffickers with Miami ties permitted such a remark. Counsel are entitled to broad latitude in the inferences they may suggest to the jury in summation.

## CONCLUSION

We have examined appellants' remaining arguments and find them to be without

merit. The judgments of conviction are affirmed.