09-3314-cr
United States v. Curley

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term 2010

(Argued: January 13, 2011    Decided: April 25, 2011)

Docket No. 09-3314-cr

------

UNITED STATES OF AMERICA,

*Appellee*,

v.

JAMES CURLEY, ALSO KNOWN AS JIM HARRIS,

*Defendant-Appellant*.

------

Before:

JACOBS, *Chief Judge*, and
WESLEY and CHIN, *Circuit Judges*.

Appeal from a judgment of the United States District Court for the Southern District of New York (Stephen C. Robinson, *J.*) convicting defendant-appellant of interstate stalking and interstate violation of a protective order.  Pursuant to Rule 404(b) of the Federal Rules of Evidence, the district court admitted evidence of prior and subsequent "bad acts" of defendant-appellant and prior "bad acts" of his brother.  We hold that the district court abused its discretion, and we vacate the conviction and remand for a new trial.

VACATED and REMANDED.

KATHRYN MOORE MARTIN, Assistant United States Attorney (Daniel L. Stein, Assistant United States Attorney, *on the brief*), *for* Preet Bharara, United States Attorney for the Southern District of New York, New York, New York, *for Appellee*.

ERIC H. JASO (Jeffrey A. Shooman, *on the brief*), Stone & Magnanini LLP, Short Hills, New Jersey, *for Defendant-Appellant*.

CHIN, *Circuit Judge*:

In this case, defendant-appellant James Curley ("Curley") was convicted of stalking and harassing his wife Linda in the summer and fall of 2006 in violation of 18 U.S.C. §§ 2261A and 2262(a)(1). At trial, the district court admitted evidence that: (1) Curley had abused Linda over the course of many years, (2) his brother had abused Linda some sixteen years earlier, and (3) Curley was the subject of a subsequent traffic stop during which his last will and testament, rifles, ammunition, a bulletproof vest, and a ski mask were found in his rental car. For the following reasons, we hold that the district court abused its discretion when it admitted evidence of the brother's actions and the traffic stop. Accordingly, we vacate the conviction and remand for a new trial.

- 2 -

## STATEMENT OF THE CASE

### A.    *The Facts*[1]

By 2006, Curley's twelve-year marriage to Linda had deteriorated.  Curley's behavior had become erratic and, in May 2006, he demanded a divorce.  Three times in the following month, he threatened to kill her.  First, during an argument, Curley threatened to kill her and "leave [her] body in a pool of blood."  Second, while they were in the car with their two children, he again threatened to kill her and promised he would not go to jail if he did.  Third, after returning from a walk, Curley told Linda:  "I found a place today where I could kill you and nobody would hear you scream."

In July 2006, Curley served Linda with divorce papers accusing her of infidelity.  Linda then filed for divorce herself and sought an order of protection and custody of the children.  From July to August 2006, Linda regularly noticed Curley's truck following her and once saw his sister following her.  She grew so frightened that she called the police and told them:  "I really, really think he's gonna kill me . . . .  Either him or his brother, somebody's gonna kill me."  In August 2006, the Rockland

---

[1]     In an evidentiary challenge, "[w]e view the evidence in the light most favorable to the government."  *United States v. Vitale*, 459 F.3d 190, 191 (2d Cir. 2006).

County Family Court granted Linda custody of the children and issued an order prohibiting Curley from, inter alia, assaulting, stalking, harassing, or intimidating her. Thereafter, Linda no longer saw him following her, but Curley began to track her through a G.P.S. device he placed on her vehicle. Curley's friend tracked the device's movements through an Internet website and forwarded the information to Curley. From August to October 2006, someone accessed the G.P.S. tracking website over 200 times.

In October 2006, Linda was involved in a car accident in New Jersey, and when she took her car to a nearby repair shop, a mechanic discovered the G.P.S. device. On October 9, 2006, Curley drove from New York to the repair shop in New Jersey. While speaking with the owner, Curley lied about his identity, giving varying reasons for his visit. After the owner wrote down the vehicle identification number of Curley's vehicle, Curley tried to alter the owner's notation. The owner reported the incident to the police and turned the G.P.S. device over to them.

B. *Proceedings Below*

The government indicted Curley on May 8, 2008. It filed a superseding indictment on October 22, 2008, charging

- 4 -

Curley with two counts of interstate stalking[2] and one count of interstate violation of a protection order.  18 U.S.C. §§ 2261A, 2262(a)(1).

By letter dated January 12, 2009, the government requested rulings *in limine* on the admissibility of certain evidence it intended to present at trial.  The government sought to introduce testimony about the following incidents of Curley's physical abuse of Linda:

- in August 2006, Curley grabbed Linda while she was holding their infant son and would not let her go;

- in 2005, he pushed Linda into a wall while she was pregnant;

- in either 2001 or 2002, he pushed Linda into a door while she was pregnant; and

- in 1991, he shoved her and banged her head against the floor.

The government also sought permission to elicit Linda's testimony that Curley's brother, Michael, beat her

---

[2] Specifically, count one charged Curley with using an Internet website "to engage in a course of conduct that caused substantial emotional distress to [Linda] and placed [her] in reasonable fear of . . . death . . . and serious bodily injury," while possessing the intent to kill, injure, harass, or place Linda under surveillance with the intent to kill, injure, harass, intimidate, or cause substantial emotional distress. *See* 18 U.S.C. § 2261A.  Count two charged Curley with traveling from New York to New Jersey with the same intent and causing the victim substantial emotional distress. *See id.*

in 1990 and that Curley later instructed her not to report the incident to the police.

Finally, the government sought to introduce evidence of Curley's traffic stop in January 2008. Police officers stopped Curley because he was driving a rental car that had been reported stolen. Curley fled on foot and was arrested. The police recovered three black powder rifles (one of which was loaded), ammunition, a bulletproof vest, and a ski mask from the car.

By order dated January 29, 2009, the district court admitted the four incidents of Curley's own violent acts against Linda. The court ruled that the evidence was either "inextricably intertwined with the charged conduct" or "relevant to the issue of intent" under Rules 404(b) and 403 of the Federal Rules of Evidence. The court barred the evidence of Michael's abuse of Linda and the traffic stop.

By letter dated February 25, 2009, the government sought to introduce new evidence regarding Linda's relationship with Michael and asked the court to reconsider its previous ruling. The government had learned that police had arrested Michael in 1994 for resisting arrest and assaulting an officer. Under pressure from Curley and

Michael, Linda testified falsely at Michael's criminal trial and in Michael's subsequent civil action against the police.

At a pretrial conference on March 5, 2009, the district court reconsidered its earlier ruling and decided "it[] [was] fair for [Linda] to say part of the reason that [she] was in fear was that [she] knew that the defendant would be assisted by his family members" because the government had to establish Linda's reasonable fear. The court indicated it was "more troubled" when there was only a single incident with Michael, but the several incidents, including evidence that Curley's sister followed Linda in 2006, formed a basis for Linda's fear that "this Curley clan . . . will come after her." The court reasoned that Linda's "course of dealing" with Curley and Michael "could place a person in fear, reasonable fear of death or serious bodily injury." Thus, the court admitted the testimony of both incidents involving Michael pursuant to Rule 404(b).[3]

At the same conference, the government revealed a handwritten "Last Will and Testament" recently found in Curley's rental car after the 2008 traffic stop and requested that the court reconsider admitting that evidence. The will indicated Curley's desire to leave all his

---

[3]     The court explained that incidents involving Michael were being considered under Rule 404(b); but the surrounding colloquy suggests they were admitted as intrinsic to the charged offense.

belongings to his children and asked his sister "to take care" of them. At the time of the arrest, Linda had sole custody of the two children. The government argued that the jury could infer from the will that Curley expected Linda to die before him. Because the will was handwritten, the government argued that Curley expected his own death imminently. Therefore, the government argued, the will, rifles, ammunition, and bulletproof vest showed that Curley was planning to murder Linda and then commit suicide.

At a pretrial hearing on March 9, 2009, the court admitted the traffic stop evidence pursuant to Rule 404(b). The court explained that it had previously denied admission under Rule 403 because the evidence's prejudicial effect substantially outweighed its probative value. According to the district court, however, the newly discovered evidence "add[ed] significantly to the probative value" of the traffic stop and helped prove Curley's intent to commit the 2006 crimes.

Trial commenced on March 9, 2009. Linda testified about Curley's prior violent acts, the incidents involving Michael, and the forced perjury. The trial judge did not immediately issue an instruction about this evidence's limited purpose. Two police officers testified about the January 2008 traffic stop and the search that uncovered the

rifles, ammunition, bulletproof vest, and ski mask. The government also showed a video of the traffic stop, which showed Curley fleeing on foot from the police. Finally, an employee of the rental car company testified about discovering the will. Before the traffic stop evidence was presented, the trial judge instructed the jury that the evidence was offered "for th[e] very specific purpose [of determining] what was [Curley's] intent back at the time of the acts charged in the Indictment." In its charge to the jury after summations, the judge reminded the jury that it could only rely on the traffic stop evidence to infer Curley's intent in 2006. The court then instructed the jury for the first time that it could rely on evidence that Curley and his brother abused Linda only to infer Linda's reasonable fear.

On March 19, 2009, the jury convicted Curley on all counts. The jury made specific findings that Curley committed interstate stalking under counts one and two with the intent to harass Linda and to place her under surveillance with the intent to harass, intimidate, and cause substantial emotional distress. Although the jury did not find that Curley had the intent to kill or injure Linda, it did find that his course of conduct caused Linda substantial emotional distress and placed her in reasonable

fear of death or serious bodily injury.  On July 29, 2010, after calculating a Guidelines range of forty-one to fifty-one months, the district court sentenced Curley to concurrent sixty-month terms of imprisonment, followed by concurrent three-year terms of supervised release.

This appeal followed.

## DISCUSSION

### A.  *Applicable Law*

Rule 404(b) of the Federal Rules of Evidence governs the admissibility of evidence of prior or subsequent "bad acts" -- evidence of "crimes, wrongs, or acts" other than those charged in the indictment.  Fed. R. Evid. 404(b).  The rule prohibits the admission of such evidence if it "prove[s] the character of a person" to show his propensity to commit the charged act, but permits its admission for other purposes.  *Id.*  This Circuit follows the "inclusionary" approach, which admits all "other act" evidence that does not serve the sole purpose of showing the defendant's bad character and that is neither overly prejudicial under Rule 403 nor irrelevant under Rule 402.  *United States v. Pascarella*, 84 F.3d 61, 69 (2d Cir. 1996).  Even under this approach, however, district courts should not presume that such evidence is relevant or admissible.  *United States v. Halper*, 590 F.2d 422, 432 (2d Cir. 1978).

A district court's evidentiary rulings are subject to review for abuse of discretion. *United States v. Mercado*, 573 F.3d 138, 141 (2d Cir. 2009). When reviewing evidence admitted pursuant to Rule 404(b), we consider whether: "(1) the prior crimes evidence was 'offered for a proper purpose'; (2) the evidence was relevant to a disputed issue; (3) the probative value of the evidence was substantially outweighed by its potential for unfair prejudice pursuant to Rule 403; and (4) the court administered an appropriate limiting instruction." *United States v. McCallum*, 584 F.3d 471, 475 (2d Cir. 2009) (citing *Huddleston v. United States*, 485 U.S. 681, 691-92 (1988)).

"Other act" evidence serves a proper purpose so long as it is not offered to show the defendant's propensity to commit the offense. *See* Fed. R. Evid. 404(b); *United States v. Pitre*, 960 F.2d 1112, 1118-19 (2d Cir. 1992). Rule 404(b) provides that such evidence may properly show "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident," Fed. R. Evid. 404(b), but this list is not exhaustive, *United States v. Williams*, 577 F.2d 188, 192 (2d Cir. 1978); *see also United States v. Mendez-Ortiz*, 810 F.2d 76, 79 (6th Cir. 1986); *United States v. Johnson*, 634 F.2d 735, 737 (4th Cir. 1980). The district court may admit evidence that serves any "non-

propensity purpose," including state of mind. *United States v. Edwards*, 342 F.3d 168, 176, 180 (2d Cir. 2003); *see also United States v. Teague*, 93 F.3d 81, 84 (2d Cir. 1996).

To satisfy the relevance inquiry, the evidence must be "sufficiently similar to the conduct at issue to permit the jury reasonably to draw from that act the [state of mind] inference advocated by the proponent of the evidence." *United States v. Peterson*, 808 F.2d 969, 974 (2d Cir. 1987). The district court must consider all the evidence presented to the jury and determine whether a reasonable jury could find the advocated inference. *Huddleston*, 485 U.S. at 690; *United States v. Ramirez*, 894 F.2d 565, 569 (2d Cir. 1990). The court abuses its discretion if the evidence is "not sufficiently similar" to the charged conduct or if "the chain of inferences necessary to connect [the] evidence with the ultimate fact to be proved [is] unduly long." *Peterson*, 808 F.2d at 974 (internal quotation marks omitted).

If the evidence is relevant, the district court must determine if its potential for unfair prejudice substantially outweighs its probative value. *See* Fed. R. Evid. 403. The evidence's probative value "depends largely on whether or not there is a close parallel between the crime charged and the acts shown." *United States v. Gordon*,

987 F.2d 902, 908 (2d Cir. 1993) (internal quotation marks omitted).  Evidence is unfairly prejudicial when "it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence."  *United States v. Massino*, 546 F.3d 123, 132 (2d Cir. 2008) (internal quotation marks omitted)).  If the other acts tend to prove a fact not in issue or "to excite emotions against the defendant," they create a prejudicial effect.  *United States v. Figueroa*, 618 F.2d 934, 943 (2d Cir. 1980).  The district court abuses its discretion when it admits "other act" evidence with a high possibility of jury misuse but with only slightly more probative value than other evidence on the same issue.  *See McCallum*, 584 F.3d at 477.

In our review, we will also consider whether the district court issued an appropriate limiting instruction. Although the law presumes that juries follow limiting instructions, *United States v. Snype*, 441 F.3d 119, 129 (2d Cir. 2006), these instructions only minimize the evidence's prejudicial effect, *Figueroa*, 618 F.2d at 943.  A limiting instruction "does not invariably eliminate the risk of prejudice notwithstanding the instruction."  *Id.*

If error did occur in the trial below, we will not vacate the conviction if the error was harmless and "d[id]

not affect substantial rights." Fed. R. Crim. P. 52(a). The erroneously admitted evidence is harmless if it "was unimportant in relation to everything else the jury considered on the issue in question." *Cameron v. City of New York*, 598 F.3d 50, 61 (2d Cir. 2010) (quoting *United States v. Germosen*, 139 F.3d 120, 127 (2d Cir. 1998)). Several factors bear on this inquiry: "'whether the testimony bore on an issue that is plainly critical to the jury's decision, whether that testimony was material to the establishment of the critical fact or whether it was instead corroborated and cumulative, and whether the wrongly admitted evidence was emphasized in arguments to the jury.'" *Id.* (quoting *Wray v. Johnson*, 202 F.3d 515, 526 (2d Cir. 2000)). "[T]he most critical factor," however, is "the strength of the government's case." *McCallum*, 584 F.3d at 478. Unless there is "fair assurance" that "the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected." *Kotteakos v. United States*, 328 U.S. 750, 765 (1946); *see United States v. Rea*, 958 F.2d 1206, 1220 (2d Cir. 1992).

B. *Application*

We consider the admissibility of three sets of evidence: first, Curley's prior abuse of Linda; second, Michael's interactions with Linda, including his abuse of

- 14 -

Linda in 1990; and third, the traffic stop and the items discovered in the car.  The district court admitted all of this evidence as probative of Curley's intent and/or Linda's fear.  Both states of mind were relevant to the charged crimes, *see* 18 U.S.C. §§ 2261A(1), 2262(a)(1), and thus the evidence served a proper purpose and was relevant to that extent, *see Teague*, 93 F.3d at 84.[4]  Our review, therefore, focuses on whether the probative value of the evidence was substantially outweighed by the risk of unfair prejudice and whether there was a sufficient limiting instruction. *McCallum*, 584 F.3d at 475.

### 1.  *Curley's Abuse of Linda*

The district court did not abuse its discretion in admitting evidence of Curley's abuse of Linda.

---

[4]     Curley's intent was an element of both the stalking and protective order counts.  *See* 18 U.S.C. §§ 2261A(1), 2262(a)(1).  Linda's fear was an element only of the stalking count, but the issue of Linda's fear was relevant to the protective order count because the jury could convict Curley on the protective order count if it found Curley had committed stalking under New York law.  *See* 18 U.S.C. § 2262.  And, as the district court instructed the jury, a person is guilty of stalking under New York law where he "engages in a course of conduct directed at a specific person, and knows or reasonably should know that such conduct . . . is likely to cause *reasonable fear* of material harm to the physical health, safety or property of such person . . . ."  N.Y. Penal Law § 120.45 (McKinney 2011) (emphasis added).  Thus, even though the victim's fear is not an express element of the protective order count, evidence of the victim's fear may be relevant to what the defendant knows or reasonably should know as to the victim's likely fear for the underlying New York crime of stalking.

First, Curley's abuse of Linda in August 2006 was part of or inextricably intertwined with the charged conduct.  He grabbed Linda while she was holding their one-year-old son during the same period that he was tracking her with the G.P.S. device.  This act was directly relevant to his intent and her fear.  *See United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000) (noting that uncharged acts are not "other acts" subject to Rule 404(b) if they "arose out of the same transaction or series of transactions as the charged offense, if [they are] inextricably intertwined with the evidence regarding the charged offense, or if [they are] necessary to complete the story of the crime on trial"); *accord United States v. Quinones*, 511 F.3d 289, 309 (2d Cir. 2007) (quoting *United States v. Concepcion*, 983 F.2d 369, 392 (2d Cir. 1992)).

Second, the evidence of Curley's abuse of Linda in the earlier years, i.e., 1991, 2001 or 2002, and 2005, was also relevant and not unfairly prejudicial.  Where the charged conduct involves domestic abuse, a spouse's history of domestic violence is relevant to show intent to harass or intimidate his partner.  *See United States v. Von Foelkel*, 136 F.3d 339, 340-41 (2d Cir. 1998) (per curiam) (ruling that the district court did not abuse its discretion in admitting evidence of prior domestic violence to prove

intent to violate protection order).  Specifically, the government had to prove that Curley possessed the intent to either kill, injure, harass or intimidate Linda and that she had a reasonable fear of death or serious bodily injury. *See* 18 U.S.C. §§ 2261A, 2262(a)(1).

The earlier acts demonstrated a pattern of activity that was probative of Curley's intent and Linda's reasonable fear.  These were aggressive acts against Linda that were similar in nature and severity to the charged conduct:  Curley's threats to kill Linda and his actions in stalking and tracking her.

The temporal remoteness of these acts does not preclude their relevancy.  The district court may exclude older acts if they have become "too attenuated" to be relevant or too remote to render the witness's memory reliable, *see United States v. Larson*, 112 F.3d 600, 605 (2d Cir. 1997), but that was not the case here.  Although the incidents pre-dated the charged conduct by as much as fifteen years, collectively they demonstrate a pattern of activity that continued up to the time of the charged conduct.  *See Howard Opera House Assocs. v. Urban Outfitters, Inc.*, 322 F.3d 125, 128-29 (2d Cir. 2003) (affirming entry of prior violations to show "pattern of behavior" and intent).

Furthermore, the district court did not abuse its discretion in concluding that the probative value of this evidence outweighed any unfair prejudice. Because Curley's prior acts paralleled the charged conduct, insofar as they involved violent treatment of his wife, they had greater probative value. *See Gordon*, 987 F.2d at 908. Moreover, the other acts were not unfairly prejudicial as they were no "more sensational or disturbing than the crimes with which [Curley] was charged." *United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990). Finally, the district court's charge to the jury, which included an appropriate instruction on this evidence's limited purpose, mitigated any lingering risk of prejudice.

Accordingly, we hold that the district court did not abuse its discretion in admitting evidence of Curley's prior bad acts.

2. *Michael's Interactions with Linda*

We conclude that the district court abused its discretion when it allowed Linda to testify that Michael beat her in 1990 and that Curley later pressured her to lie in court about Michael's assault of a police officer in 1994. This evidence was not sufficiently similar to the charged crimes to allow the jury to reasonably infer Linda's fear. *See Peterson*, 808 F.2d at 974. Curley was charged

with traveling across state lines with the intent to harass or intimidate Linda, and with using a computer for the same illegal purpose.  There was no allegation that Curley conspired with his brother or his family to commit these crimes.

Furthermore, Michael's activities did not parallel any of the underlying conduct.  No evidence was presented that Michael or any other family member accompanied Curley to the New Jersey repair shop or otherwise participated in the charged conduct.  The government argued that the perjury scheme was similar to Curley's threat to kill Linda and escape punishment because both showed that criminal punishment did not deter Curley.  True, when Curley threatened Linda in 2006, his plan to avoid prison was to "put the house up, [and] get a good attorney."  But there is little similarity between this threat and the earlier alleged perjury scheme involving Michael.

The district court relied on the fact that Linda once saw Curley's sister following her in 2006 to justify admitting the evidence involving his brother because collectively it showed that "this Curley clan" would "come after [Linda]."  Yet, Linda only testified that she saw Curley's sister driving behind her once and that, after she took a detour, only Curley was following her.  There was no

connection between his sister's single act in 2006 and his brother's activities twelve years earlier. *See Larson*, 112 F.3d at 605. The government offered no evidence to suggest that Curley conspired with Michael against Linda at any time between 1994 and 2006 or that Michael was anywhere in the picture in 2006. Thus, the probative value of the evidence of Michael's actions toward Linda in 1990 and 1994 was slim. *See Gordon*, 987 F.2d at 908.

At the same time, there was a high risk that the evidence of Michael's conduct would unfairly prejudice Curley. The activities were not closely parallel, and the evidence served no real purpose other than to show that Michael -- not Curley -- had a bad character. *See Massino*, 546 F.3d at 132-33. There was a risk that the jury indeed would speculate that the "Curley clan" was coming after Linda, rather than focusing on the allegations in the indictment.

Although the district court issued an instruction regarding the evidence's limited purpose in its charge to the jury, "limiting instructions cannot be regarded as a guaranty against prejudice." *Figueroa*, 618 F.2d at 946. We conclude that the instruction here was not sufficient, given the low probative value of the evidence and the high risk of prejudicial effect. *See id.* at 943. Moreover, the

instruction did not come until well after the evidence was presented and after summations.  *See United States v. Royer*, 549 F.3d 886, 901 (2d Cir. 2008) (reasoning that "timely cautionary instructions . . . reduced the potential for prejudice" arising from inflammatory testimony); *Pitre*, 960 F.2d at 1120 (affirming admission of evidence under Rule 403 where "the district judge gave proper limiting instructions . . . both during the trial and in his charge to the jury following summations").  Because this evidence had a greater risk of prejudice than the testimony of Curley's abuse of Linda, a single instruction in the jury charge was not sufficient.

Accordingly, we hold that the district court erred in admitting the evidence relating to Michael.

3. *The Traffic Stop*

Likewise, we conclude that the district court abused its discretion when it admitted evidence that police stopped Curley while he was driving a reportedly stolen rental car in January 2008 and found three black powder rifles, ammunition, a bulletproof vest, a ski mask, and a last will and testament in the vehicle.  The government offered this evidence to show Curley's intent and Linda's fear in October of 2006 -- some fourteen months earlier.

Subsequent acts are admissible under Rule 404(b), *see United States v. Germosen*, 139 F.3d 120, 128 (2d Cir. 1998), but the temporal difference between the charged conduct and the subsequent acts may impact whether the evidence is probative, *see United States v. Rutkoske*, 506 F.3d 170, 177 & n.3 (2d Cir. 2007). This Circuit has upheld the admission of subsequent act evidence to prove a state of mind only when it so closely paralleled the charged conduct that it was probative regardless of the temporal difference. *See, e.g.*, *id.* at 174, 178 (upholding admission of conversations regarding one securities fraud scheme to show knowledge of another securities fraud scheme four years earlier "[i]n light of the similarity between the [two] schemes"); *Germosen*, 139 F.3d at 124-25, 128 (upholding admission of subsequent fraud scheme, originally charged as part of same conspiracy, to show intent to defraud); *Ismail v. Cohen*, 899 F.2d 183, 185, 188-89 (2d Cir. 1990) (upholding admission of police officer's attack on another civilian, two months after same officer's alleged attack on plaintiff, to show pattern and intent); *United States v. Ramirez*, 894 F.2d 565, 567, 569 (2d Cir. 1990) (upholding admission of subsequent attempted cocaine sale to show knowing participation in cocaine trade during earlier transaction); *United States v. Viruet*, 539 F.2d 295, 296-97

(2d Cir. 1976) (per curiam) (upholding evidence of participation in transactions with stolen goods to show intent to participate in earlier stolen goods conspiracy).

We conclude that the subsequent traffic stop lacks the necessary parallel to the charged acts. The government argues that the traffic stop is sufficiently connected to the charged conduct because they involved the same assailant, victim, and purpose. *See United States v. Hinton*, 31 F.3d 817, 822-23 (9th Cir. 1994). Yet, there was insufficient evidence indicating Curley's activities that day were related to or directed at Linda, and no evidence that Curley engaged in any threatening activity toward Linda in the fourteen months before the traffic stop. The jury could only speculate that Curley was targeting Linda in January 2008.

To relate the traffic stop evidence to the charged conduct, the jury had to construct a tenuous and unduly long chain of inferences without any further evidentiary guidance. The jury would have had to infer that: Curley wrote the will because he expected to die; he provided in the will for a guardian for his children because he expected Linda to die as well; he was going to use the rifles to kill Linda first; he was then going to commit suicide, perhaps "suicide-by-cop"; and, finally, he had the same intent to

kill Linda fourteen months earlier.  We conclude that this chain is too attenuated to link the two events together. *See Peterson*, 808 F.2d at 974, 976.[5]

The government and the district court relied primarily on the will's request that Curley's sister "take care" of his children to support the inference that Curley anticipated Linda's death.  Yet, the record contained insufficient evidence to permit the jury to reasonably infer that Curley expected Linda to be dead when he wrote the will.  It was certainly possible that Curley only preferred that Linda not have custody, since he contested custody in the divorce proceeding.  It was also possible he never thought of Linda when he wrote the will, and that he was simply expressing the wish that his sister "take care" of his children.  Without further evidentiary guidance, the jury had no reason to determine that Curley planned for Linda to die before him.

Furthermore, the will was undated, and the record provides no indication of when it was written.  Although the government notes that Curley necessarily wrote the will after his son's birth in 2005 (because the will references

---

[5]     As the district court observed when it initially ruled this evidence inadmissible:  "We can't say something that happens a year and a half, a year and three months later is what put her in fear of his acts a year and a half before."

- 24 -

him), this inference provides little assistance.  Curley could have written the will the day of the incident in 2008.  He also could have written it in 2006 after he filed for divorce and before Linda was awarded custody.  Or he could have written the will at a time wholly irrelevant to this case.  The jury could only speculate on this point.

Similarly, it is far from clear that the rifles, bulletproof vest, and ski mask showed that Curley intended to kill Linda or himself.  The three rifles were black powder single-shot rifles, more in the nature of antiques than real weapons.  The combination of these muskets, ammunition, a bulletproof vest, and a ski mask in a rented car certainly show that Curley was behaving bizarrely, and that he might well have been planning a violent criminal act of some kind; but it is a stretch to conclude from this evidence that fifteen months earlier Curley intended to kill Linda.

Finally, the January 2008 events bore little similarity to Curley's prior conduct.  Although Curley repeatedly threatened to kill Linda in 2006, he never threatened to use a firearm or to kill himself in the process.  Likewise, none of the evidence of Curley's longstanding physical abuse of Linda involved firearms.

With such a weak correlation to the charged conduct, the traffic stop evidence lacked probative value.

Whatever probative value the evidence may have had, its highly prejudicial effect rendered it inadmissible. The traffic stop evidence was certain to arouse the jury's emotions against Curley because it was significantly more sensational and disturbing than the charged crimes. *See Roldan-Zapata*, 916 F.2d at 804. The introduction of guns into the trial was especially troubling because it tended to show Curley was more violent and disturbed than he appeared from the other evidence. The events in 2008 were not so closely parallel to the charged conduct that they became probative of his intent in 2006. *See Gordon*, 987 F.2d at 908. Therefore, their potential for prejudice substantially outweighed their probative value.

The limiting instructions did not suffice to protect the defendant from the risk of unfair prejudice. The presumption that juries follow limiting instructions "is dropped where there is an overwhelming probability that the jury will be unable to follow the court's instructions and the evidence is devastating to the defense." *United States v. Williams*, 585 F.3d 703, 709 (2d Cir. 2009). The traffic stop evidence had little probative value regarding Curley's intent in 2006 and its primary effect was to show Curley's

bad character and incite the jury.  The jury would have had great difficulty isolating the evidence's minor probative value from its inflammatory nature.  The only proper approach was to exclude the evidence entirely.  Because the district court failed to do so, it abused its discretion.

### 4.  *Harmless Error*

The record does not provide us with fair assurance that the erroneously admitted evidence -- the combination of the evidence of the traffic stop and Michael's actions -- did not substantially sway the jury.  The evidence did not merely corroborate the evidence of Curley's verbal threats and acts of aggression, but instead it introduced the notion of guns into the case and was perhaps the government's most dramatic evidence that Curley might have actually intended to carry out his threats.  Moreover, the government highlighted the evidence during summations.  *See Cameron*, 598 F.3d at 61.  These factors weigh in favor of ruling that the errors affected Curley's substantial rights.

We cannot say with fair assurance that the highly prejudicial evidence on this point did not factor into the jury's decision.  *Kotteakos*, 328 U.S. at 765.  We conclude that the errors were not harmless and the conviction therefore must be vacated.

- 27 -

### CONCLUSION

Because we conclude that the district court abused its discretion and that error affected substantial rights, we VACATE the conviction and REMAND for a new trial.[6] The mandate shall issue forthwith.

---

[6] In his appeal, Curley also challenged the reasonableness of his sentence. Because we vacate the conviction, we need not reach this issue.