*United States v. Zhong*

# In the
# United States Court of Appeals
## FOR THE SECOND CIRCUIT

---

AUGUST TERM 2020
No. 19-4110

**UNITED STATES OF AMERICA,**
*Appellee*,

v.

**DAN ZHONG,**
*Defendant-Appellant*.*

---

On Appeal from the United States District Court
for the Eastern District of New York

ARGUED: MARCH 9, 2021
DECIDED: FEBRUARY 23, 2022

---

Before:      SACK, WESLEY, and MENASHI, *Circuit Judges*.

Dan Zhong appeals his conviction, after a jury trial, on five counts: (1) forced-labor conspiracy in violation of 18 U.S.C. § 1594(b); (2) forced labor, in violation of 18 U.S.C. § 1589(a) and (b); (3) concealing passports and immigration documents in connection

---

* The Clerk of Court is directed to amend the caption as set forth above.

with forced labor, in violation of 18 U.S.C. § 1592(a); (4) alien smuggling conspiracy, in violation of 8 U.S.C. § 1324(a)(1)(A)(v)(I); and (5) visa fraud conspiracy, in violation of 18 U.S.C. § 371. These convictions related to Zhong's leading role in a Chinese construction company named Rilin in the years 2010 to 2016. Zhong contends that the district court committed evidentiary errors that played a role in the jury's decision to convict him. We agree in part. The district court committed evidentiary errors that may well have affected the jury's decision to convict Zhong on the three forced-labor counts. Those errors, however, were unconnected to Zhong's other two counts. Zhong also contends that the government presented insufficient evidence to allow a jury to convict him on the alien smuggling count. We disagree. Accordingly, we **AFFIRM** Zhong's convictions on the alien smuggling and visa fraud counts, **VACATE** Zhong's convictions on the three forced-labor counts, and **REMAND** for a new trial on the forced-labor counts consistent with this opinion. Additionally, while our vacatur of the forced-labor convictions requires us to **REMAND** for resentencing for the visa fraud count, we **AFFIRM** Zhong's alien smuggling sentence.

————

ALEXANDER A. SOLOMON, Assistant United States Attorney (David C. James, Jo Ann M. Navickas, Ian C. Richardson, Craig R. Heeren, Assistant U.S. Attorneys, *on the brief*), *for* Breon Peace, United States Attorney for the Eastern District of New York, Brooklyn, New York, *for Appellee.*

2

ALEXANDRA A.E. SHAPIRO (Daniel J. O'Neill, Julian S. Brod, *on the brief*), Shapiro Arato Bach LLP, New York, New York, *for Defendant-Appellant*.

MENASHI, *Circuit Judge*:

Dan Zhong appeals his conviction in the U.S. District Court for the Eastern District of New York (Donnelly, J.), after a jury trial, on five counts: (1) forced-labor conspiracy, in violation of 18 U.S.C. § 1594(b); (2) forced labor, in violation of 18 U.S.C. § 1589(a) and (b); (3) concealing passports and immigration documents ("document servitude") in connection with forced labor, in violation of 18 U.S.C. § 1592(a); (4) alien smuggling conspiracy, in violation of 8 U.S.C. § 1324(a)(1)(A)(v)(I); and (5) visa fraud conspiracy, in violation of 18 U.S.C. § 371. These convictions related to Zhong's role as a leading figure in a Chinese construction company named Rilin in the years 2010 to 2016.

Zhong contends that the district court committed evidentiary errors. We agree. First, before the case was transferred, the district court (Irizarry, J.) held that it was permissible for the government to introduce evidence of uncharged criminal conduct. That evidence, however, was "significantly more sensational and disturbing than the charged crimes." *United States v. Curley*, 639 F.3d 50, 62 (2d Cir. 2011).

Second, the government called one witness—and one witness only—to provide testimony of Zhong's personal involvement in that uncharged conduct. Yet, in violation of Rules 608(a) and 803(21), the district court did not permit Zhong to elicit testimony from other witnesses regarding that key witness's reputation for truthfulness.

3

Third, the district court permitted the government's forced-labor expert witness not only to explain the workings of forced-labor operations in general but also to provide a detailed commentary on the specific facts of Zhong's alleged forced-labor operation. With this testimony, the expert came "dangerously close to usurping the jury's function" by effectively "providing an overall conclusion of criminal conduct." *United States v. Dukagjini*, 326 F.3d 45, 54 (2d Cir. 2003). The expert also provided general testimony regarding the emotional pleasure perpetrators of forced labor derive from their activities, the disreputable history of forced labor worldwide, and the Chinese government's poor forced-labor record. This testimony was highly prejudicial and, at best, minimally relevant to Zhong's prosecution.

Because "we cannot conclude with fair assurance" that "the cumulative effect of" the district court's erroneous evidentiary rulings "did not substantially influence the jury" in its decision to convict Zhong of the three forced-labor charges, we vacate those convictions. *United States v. Al-Moayad*, 545 F.3d 139, 159, 169 (2d Cir. 2008) (internal quotation marks omitted). Because the government's properly admitted trial evidence could support Zhong's forced-labor convictions, we remand for a new trial on those counts.

The erroneously admitted evidence, however, did not bear on the alien smuggling and visa fraud charges the government leveled against Zhong. Zhong separately argues that the government failed to present sufficient evidence to allow a jury to convict him on the alien smuggling count. Specifically, Zhong contends that—although the evidence shows that Rilin workers overstayed their visas and worked on projects outside the scope of their visas—the government failed to produce evidence that Zhong conspired to transport Rilin workers "in furtherance of" their unlawful presence in the United

4

States. 8 U.S.C. § 1324(a)(1)(A)(ii). We disagree. Although the evidence presented at trial showed that Rilin workers were not completely isolated from the public, other evidence demonstrated that Rilin (led by Zhong) engaged in concerted efforts to shield Rilin workers from local Chinese-speaking populations and instructed them not to participate in public events. A reasonable jury could have concluded that the practice of transporting workers directly to and from work sites was part of an effort to limit the opportunities for others to speak to Rilin workers and to discover the workers' immigration status—and thus to ensure that the workers' illegal presence continued. We therefore affirm Zhong's conviction and sentence on the alien smuggling count. We also affirm Zhong's conviction for visa fraud conspiracy, although our vacatur of the forced-labor convictions requires us to remand for resentencing on that count.

In sum, we affirm in part, vacate in part, and remand for further proceedings consistent with this opinion.

## BACKGROUND

A jury convicted Dan Zhong of five charges: (1) forced-labor conspiracy, (2) forced labor, (3) document servitude in connection with forced labor, (4) alien smuggling conspiracy, and (5) visa fraud conspiracy. The government charged Zhong with these crimes based on his work for Rilin from 2010 to 2016. To illustrate why we cannot conclude with fair assurance that the district court's erroneous evidentiary rulings did not substantially influence the jury's decision to convict Zhong of the three forced-labor charges, we first present the facts as demonstrated by the trial evidence that Zhong appears to concede was rightfully admitted. We then supplement that narrative

with facts from the evidence that Zhong argues the jury should never have heard.

## I

Dan Zhong served as an accredited diplomat of the People's Republic of China from 2001 to 2009. During that time, he held a management-level position at a Chinese construction and real estate company named Rilin, which was owned and operated by his uncle, Wenlaing Wang. Rilin employed many of Zhong's family members in executive-level positions. In November 2009, Zhong ended his diplomatic status and became the official head of Rilin's operations in the United States.

Rilin entered into agreements with the United States to bring Chinese workers to the United States to work on two projects at Chinese diplomatic facilities. The U.S. State Department approved one of these projects in 2010 and the other in 2012, and it issued visas to Rilin employees that allowed the employees to come to the United States to work on these projects. Zhong coordinated the visa applications. Once these workers were in the country, however, Rilin transported them to work at nine other worksites, including a twelve-story building on Fifth Avenue.[1] These construction projects lay outside the scope of the workers' visas. Zhong was aware of and directed this activity.

---

[1] At the Fifth Avenue project, Rilin employees worked alongside a U.S.-based general contractor, a U.S.-based safety-services manager, and under U.S.-hired managers. The workers were not guarded or prevented from leaving the site.

Rilin structured its employment relationship with its workers as follows. In order to work for Rilin, workers had to pay a substantial security deposit. The workers then agreed to work for Rilin in the United States for a salary that substantially surpassed what they would make in China. Almost all of the salary, however, was to be paid to them only once they completed their service in the United States. Rilin retained the right to determine the workers' completion dates. While they worked in the United States, the workers' families could withdraw small sums, equal to about 10 percent of the workers' salaries, every two months. Zhong held the workers' passports and visas while they were in the United States. When the workers returned to China, Rilin refunded the security deposit with interest.

When in America, workers were subject to prohibitions against "[w]ords and deeds that are detrimental to national prestige or [Rilin's] reputation," "[c]ommunicating with overseas relations (or organizations) without permission," "stirring up trouble," "slacking at work," "[w]orking for a third party without permission," "[l]eaving ... worksites and living quarters without permission," "separat[ing] from [Rilin's] management and runaway to the United States," and "[r]unning away." App'x 990-92. If a worker violated these prohibitions, the contract provided that the worker would be subject to "administrative sanctions and monetary penalties," which included forfeiture of the security deposit and unpaid wages, and "repatriat[ion] to [China]." App'x 991. In addition, the contract stipulated that the workers would reimburse Rilin for "monetary losses" that Rilin incurred as a result of the workers' violation of these prohibitions—monetary losses that included the cost associated with, among other things, "dispatching people for search." App'x 991.

7

Rilin housed its workers in centralized locations and kept a list of employees who absconded. In one instance in 2010, Zhong asked a Rilin employee if he knew the whereabouts of Kai Kang, an employee who had run away. Kang's wife testified that, after Kang absconded, Rilin obtained a judgment against her in China, and Rilin told her that she owed the company one million renminbi (RMB).[2] After she said she did not have that much money, Kang's wife testified, Rilin personnel "said they would look for my daughter." App'x 640.[3]

A government cooperating witness, Ken Wang, testified that he once heard Zhong describe what happened to a worker who escaped, saying something to the effect of "we found him, and we punish him. We want to set up a good example to the rest of workers. And if they dare to escape, or try to follow that guy's steps, we will beat him up badly." App'x 435. It is not clear when this conversation took place. In 2009, another Rilin worker, Guoliang Yan, told his co-workers that he once tried to "bring ... back" a former Rilin employee. App'x 213.

At all times, Zhong and Rilin attempted to ensure that the workers would not reside near local Chinese communities. Rules posted in the workers' residences prohibited them from "[c]ontacting local Chinese, overseas Chinese and overseas Chinese students" as well as from "[p]articipating in any type of parades and public gatherings, as well as accepting any type of social surveys and free tickets." Gov't App'x 218. When workers left their residences, they were to "[g]o out with at least two other people and report to the

---

[2] Roughly $157,000 in current U.S. dollars.

[3] Kang's wife was unaware of any efforts by Rilin to collect the money, App'x 640, and nothing happened to her daughter, App'x 637-38.

dormitory management personnel about time and destinations." Gov't App'x 218-19.

In 2011, local law enforcement in New Jersey was called to two houses in which Rilin lodged its workers. One was a single-family residence that had been configured to accommodate twenty-eight workers and twelve workstations with computers in the basement. The doors to both houses were equipped with double-cylinder locks, which meant the doors could be locked from the outside. The officers issued violations relating to overcrowding, unsafe wiring, and other safety infractions.

After these incidents, Rilin moved the workers to more spacious residences that did not feature the same double-cylinder locks. When local authorities inspected the Rilin living premises in 2016, the authorities found that the premises were clean and not overcrowded. They also found bicycles and fishing equipment.

Rilin workers visited landmarks in New York and various other locations in the United States. They also, on at least one occasion, attended a holiday party with neighbors and helped a neighbor shovel snow. The evidence also showed that the workers had access to mobile phones.

Zhong offered stipulated testimony from three former Rilin employees,[4] two of whom served as personal drivers to either Zhong or Wenliang Wang, Zhong's uncle and Rilin's owner. These former employees testified that they had positive experiences and earned

---

[4] No Rilin employees from the indictment period (2010-16) testified because Rilin sent all its workers back to China in 2015 and 2016, after the government began issuing Rilin grand jury subpoenas.

multiples of what they would have earned in China. They also said that their movements were not restricted and that they had access to mobile phones and the internet.

## II

Zhong challenges the introduction of two categories of evidence that the district court admitted over his objection: (1) testimony about the experiences of three Rilin workers in 2001 and 2002, almost a decade before the indictment period, and (2) testimony of the government's forced-labor expert, Luis C. DeBaca.

## A

The government called three witnesses—Kevin Liu, Zhaoyou Li, and Yuansheng Chu—to testify about their attempts to escape from Rilin in 2001 and 2002. Liu testified that after the second of two escapes, he was apprehended by a group of people, including Li, whom Rilin sent to recover him. Liu testified that these Rilin employees "mobbed" him and injured his face; "there was blood everywhere." App'x 271-73. He was then confined in a room at the Chinese consulate, where other Rilin workers monitored him. While imprisoned, Liu received a phone call from Wenliang Wang, who warned Liu not to flee again, lest he suffer a broken leg or risk harm to his family in China.

Li testified that Rilin directed him to help apprehend Liu and to guard Liu's room. Li also confirmed the substance of Wenliang Wang's threatening call to Liu. Li further testified that a Rilin crew tried to apprehend him when Li subsequently defected and that the crew lacerated his back with a construction tool during this attempt. The government showed pictures of the injury. Finally, Chu testified

that, after he defected, Zhong's brother approached him to demand that he return to Rilin. The government also elicited testimony that Rilin evicted Liu's and Li's families from their homes in China.

When Zhong objected before the trial to the introduction of this evidence, the government said the witnesses would establish that Zhong was personally involved in the conduct. At trial, however, none of these witnesses testified to Zhong's personal involvement. The government repeatedly invoked these witnesses' testimony in its opening and closing statements and asserted that Zhong was responsible for sending "rendition squads" to abduct these workers. App'x 755. In fact, the government began its opening statement with its own dramatic recounting of Liu's abduction. Additionally, although the government did not prosecute Zhong for these alleged incidents,[5] the district court instructed the jury that it could consider this testimony as direct evidence of Zhong's participation in a forced-labor conspiracy from 2010 to 2016.

---

[5] Zhong possessed diplomatic immunity at the time he allegedly committed the pre-indictment acts. The district court concluded that Zhong "is entitled to residual immunity from prosecution" but that "the government may admit evidence of [his] acts while he was an accredited diplomat as direct evidence, and to prove [his] intent, planning, and knowledge of the alleged forced labor conspiracy" during the later period. App'x 99. *Cf. Swarna v. Al-Awadi*, 622 F.3d 123, 135 (2d Cir. 2010) (noting that residual immunity protects "only such acts as are directly imputable to the state or inextricably tied to a diplomat's professional activities"). On appeal, neither party challenges the district court's conclusion that Zhong is entitled to residual immunity.

**B**

The government called a former prosecutor and diplomat, Luis C. DeBaca, as an expert witness to describe "the complex nature of forced labor and human trafficking operations" and "particular aspects of human trafficking and forced labor that are prevalent in, or unique to, the People's Republic of China." App'x 113.1. DeBaca was a fellow at Yale University who studied "Modern Slavery." App'x 113.1. Previously, he served as ambassador-at-large for the U.S. State Department Office to Monitor and Combat Trafficking in Persons, which coordinates U.S. government activities involving international forced-labor practices.

DeBaca offered testimony covering topics including forced labor, document servitude, alien smuggling, and debt bondage; he provided definitions for those terms in his testimony. He testified about why organizations engage in forced labor, the emotional pleasure that perpetrators of forced-labor operations derive from their activities, the typical methods used to perpetrate forced labor, and reasons why workers may remain in servitude. He discussed the Rilin employment contracts already in evidence and identified aspects he labeled "red flags" or "troubling." App'x 375-76, 384. To provide background for his expert views, he discussed the history of slavery and sharecropping in the United States. He also told the jury that forced-labor schemes involving migrant Chinese labor and Chinese businesses operating abroad are common, especially in the construction industry. He testified about the prevalence of forced labor in China, including "reeducation through labor camps" for Uighur Muslims and forced labor for the mentally and physically disabled, whom, DeBaca reported, Chinese businessmen "scoop[] up

12

in railway stations … and take[] out to brick kilns … or to other very dangerous and dirty jobs." App'x 363, 366-67.

The government referenced DeBaca's testimony numerous times in its closing statement, asking the jurors to rely on that testimony in determining whether Zhong's actions constituted forced labor.

**III**

In addition to objecting to the admission of the two categories of evidence, Zhong sought to impeach the credibility of the government's cooperating witness, Ken Wang. No other witness provided testimony that Zhong engaged in conduct that was similar to the pre-indictment conduct described by Liu, Li, and Chu. Yet the district court prevented Zhong from introducing evidence regarding Wang's reputation for truthfulness as well as evidence from a separate proceeding to which Wang was a party in which the court had ruled against Wang and questioned his testimony.

Zhong also asked the district court to instruct the jury that one does not violate the forced-labor statute when he warns an employee of "adverse but legitimate consequences" of violating an employment agreement. The court rejected this request.

The jury returned a verdict of guilty on all five counts. The district court sentenced Zhong to 190 months in prison on the forced-labor and forced-labor-conspiracy counts. In doing so, it rejected Zhong's argument that his sentence should be reduced due to the conditions of his confinement before and during trial. The district court also sentenced Zhong to a concurrent 108-month sentence for his alien smuggling conspiracy conviction. Finally, the district court

imposed concurrent sixty-month sentences for the counts of document servitude in connection with forced labor and of visa fraud conspiracy.

Zhong timely appealed, challenging his conviction and his sentence.

## DISCUSSION

Zhong disputes his conviction and his sentence on several grounds. First, Zhong claims that the district court erred by refusing to give an "adverse but legitimate consequences" jury instruction with respect to the forced-labor charges. Second, Zhong argues that the district court committed three sets of evidentiary errors that led the jury to convict him: allowing testimony of the 2001 and 2002 pre-indictment conduct, preventing Zhong's attempts to impeach Ken Wang, and permitting DeBaca's testimony. Third, Zhong insists that the government presented insufficient evidence to allow a reasonable jury to convict him either of the forced-labor or of the alien smuggling counts. Fourth, Zhong claims that his sentence is unreasonable.

We find merit in Zhong's second argument—but not in the remaining arguments—and therefore vacate Zhong's conviction on the three forced-labor counts and remand for a new trial on those charges. We affirm Zhong's alien smuggling and visa fraud convictions. While our vacatur of the forced-labor convictions requires us to remand for resentencing on the visa fraud count, Zhong's alien smuggling sentence remains intact.

## I

Zhong argues that the district court erred by refusing to instruct the jury that it could not convict him of forced labor if it found

that Rilin workers felt compelled to stay working for Rilin due merely to Rilin's threatening "adverse but legitimate consequences" incident to an employment relationship.

We review challenges to jury instructions de novo. *United States v. Quattrone*, 441 F.3d 153, 177 (2d Cir. 2006). "A jury instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law." *United States v. Dinome*, 86 F.3d 277, 282 (2d Cir. 1996). We consider a challenged jury instruction "not in isolation but as a whole to see if the entire charge delivered a correct interpretation of the law." *United States v. Ng Lap Seng*, 934 F.3d 110, 129 (2d Cir. 2019) (internal quotation marks omitted). A harmless error standard of review applies if the defendant objected to the instruction, which Zhong did. *Id.*

The forced-labor statute penalizes any person who "knowingly provides or obtains the labor or services of a person" through, among other things, "serious harm or threats of serious harm to that person or another person." 18 U.S.C. § 1589(a)(2). The statute defines "serious harm" to encompass "any harm ... that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." 18 U.S.C. § 1589(c)(2). Zhong argues, consistent with the decisions of two other circuits, that this definition excludes "adverse but legitimate consequences" incident to an employment relationship. *Muchira v. Al-Rawaf*, 850 F.3d 605, 624 (4th Cir. 2017) (quoting *Headley v. Church of Scientology*, 687 F.3d 1173, 1180 (9th Cir. 2012)). In other words, Zhong argues that "legitimate consequences," *id.*, cannot constitute "serious harm" under the statute, 18 U.S.C. § 1589(c)(2).

15

Whether an employer's threatened consequences are "legitimate" and therefore do not qualify as "serious harm" will depend on the "surrounding circumstances" in each case. 18 U.S.C. § 1589(c)(2). A court, however, need not presume that a jury will mistake legitimate consequences for harm. The decision whether to give an "adverse but legitimate consequences" instruction therefore lies within the district court's discretion.

While there may be some forced-labor prosecutions in which a court would abuse its discretion by failing to give such an instruction—such as one in which the government presented evidence of employer conduct that had a coercive effect but was undeniably legitimate as a matter of law—Zhong has failed to demonstrate that this case required such an instruction. Zhong argues that without the instruction the jury could have convicted him of forced labor based solely on the threatened consequences provided in Rilin workers' "voluntarily entered into employment agreement[s]." App'x 113.58; Appellant's Br. 57. Perhaps. But Zhong offers no support for his implicit assumption that the consequences of a "voluntarily entered into employment agreement" are always legitimate and can never amount to serious harm. That assumption is inconsistent with case law recognizing that a victim's initial willingness to perform certain labor does not preclude the possibility that the victim's continued labor may become forced. *See United States v. Marcus*, 628 F.3d 36, 45 (2d Cir. 2010); *see also United States v. Mussry*, 726 F.2d 1448, 1454 n.6 (9th Cir. 1984) ("Even though a person may come to a job voluntarily, subsequent coerced service constitutes involuntary servitude.") (citing *United States v. Harris*, 701 F.2d 1095, 1100 (4th Cir. 1983)), *abrogated on other grounds*, *United States v.*

16

*Kozminski*, 487 U.S. 931 (1988).[6] The district court therefore did not abuse its discretion in declining to give an "adverse but legitimate consequences" jury instruction.

## II

We turn next to Zhong's claim that the district court made erroneous and prejudicial evidentiary decisions. We review evidentiary rulings for abuse of discretion. *United States v. Scully*, 877 F.3d 464, 473 (2d Cir. 2017). "A district court has abused its discretion if it has (1) based its ruling on an erroneous view of the law, (2) made a clearly erroneous assessment of the evidence, or (3) rendered a decision that cannot be located within the range of permissible decisions." *Warren v. Pataki*, 823 F.3d 125, 137 (2d Cir. 2016).

## A

Zhong argues that the district court should not have permitted the introduction of evidence regarding violence and threats visited upon Liu, Li, and Chu in 2001 and 2002, eight years before the indictment period began. We agree.

Our cases applying Rules 403 and 404(b) of the Federal Rules of Evidence guide our decision. Rule 404(b) provides that "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person

---

[6] *Cf. Clyatt v. United States*, 197 U.S. 207, 215 (1905) ("Peonage is sometimes classified as voluntary or involuntary; but this implies simply a difference in the mode of origin, but none in the character of the servitude. The one exists where the debtor voluntarily contracts to enter the service of his creditor. The other is forced upon the debtor by some provision of law. But peonage, however created, is compulsory service,—involuntary servitude.").

acted in accordance with the character." Fed. R. Evid. 404(b)(1). That rule does not require that the government limit its case strictly to evidence of the specific criminal conduct by which the defendant commits the charged crime. Rather, "[e]vidence of uncharged criminal conduct is not evidence of 'other crimes, wrongs, or acts' under Rule 404(b) if that conduct 'arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial.'" *United States v. Robinson*, 702 F.3d 22, 37 (2d Cir. 2012) (quoting *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000)). Moreover, evidence of other acts "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). Indeed, "[t]his Circuit has adopted an 'inclusionary' approach to other act evidence under Rule 404(b), which allows such evidence to be admitted for any purpose other than to demonstrate criminal propensity." *United States v. Scott*, 677 F.3d 72, 79 (2d Cir. 2012).

Still, a district court may not freely admit evidence of conduct simply because it relates to the charged crimes or the government offers it for a purpose other than to demonstrate the defendant's propensity to commit the alleged conduct. Our "inclusionary rule is not a carte blanche to admit prejudicial extrinsic act evidence [that] is offered to prove propensity," *id.*, or otherwise to allow "propensity evidence in sheep's clothing," *United States v. McCallum*, 584 F.3d 471, 477 (2d Cir. 2009).

Additionally, the rule permits the government to offer "'other act' evidence ... to show knowledge or intent" only when "such evidence [is] 'sufficiently similar to the conduct at issue' to permit the

jury to draw a reasonable inference of knowledge or intent from the other act." *United States v. Cadet*, 664 F.3d 27, 32 (2d Cir. 2011) (quoting *United States v. Peterson*, 808 F.2d 969, 974 (2d Cir. 1987)). Even when our precedents would otherwise allow the district court to admit evidence of uncharged criminal conduct "to complete the story of the crime on trial" or to demonstrate some fact in issue "other than ... a defendant's criminal propensity," a district court may admit that evidence only if it "satisfies the probative-prejudice balancing test of Rule 403 of the Federal Rules of Evidence." *United States v. Greer*, 631 F.3d 608, 614 (2d Cir. 2011); *see also United States v. Hsu*, 669 F.3d 112, 118-19 (2d Cir. 2012). Rule 403 provides that a "court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. Applying that rule, we have held that a district court abuses its discretion when it admits evidence of uncharged conduct that "was significantly more sensational and disturbing than the charged crimes." *Curley*, 639 F.3d at 62.[7]

---

[7] In *Curley*, the defendant was charged with stalking and harassing his wife. 639 F.3d at 53. The district court allowed the government to present evidence showing that on one prior occasion, "police recovered three black powder rifles (one of which was loaded), ammunition, a bulletproof vest, and a ski mask from [a rental] car" Curley was driving. *Id.* at 55. We held that "[w]hatever probative value the evidence may have had, its highly prejudicial effect rendered it inadmissible" because it "was certain to arouse the jury's emotions against Curley because it was significantly more sensational and disturbing than the charged crimes." *Id.* at 62. We added that "[t]he introduction of guns into the trial was especially troubling

In this case, the government charged Zhong for his Rilin-related activities between 2010 and 2016. The government's trial evidence showed that during the 2010-16 period, Rilin and Zhong used harsh employment contracts, held workers' passports and visas, housed workers in crowded residences that could be locked from the outside, and, in one instance, obtained a judgment against the family of an escaped employee and told the family that they owed 1 million RMB.

Nevertheless, the government sought to bolster its case by presenting evidence of coercive measures that were more extreme—and that took place almost a decade before the indictment period—including kidnappings, weapon use, imprisonment, threats of physical injury, and evictions of workers' families. The government argues that this evidence of uncharged criminal conduct was admissible both to "complete the story" of Zhong's charged crimes, *Robinson*, 702 F.3d at 37, and to prove Zhong's "intent," "knowledge," and "plan[ning]" of the charged crimes of forced labor during the indictment period, Fed. R. Evid. 404(b)(2). The pre-indictment evidence of violence and threats was not admissible under either of these theories.

If "necessary," the government may introduce evidence of uncharged criminal conduct "to complete the story of the crime on trial," not to tell a new one. *Robinson*, 702 F.3d at 37. Here, the government's evidence from the indictment period—drawing all inferences in its favor—tells a story of a forced-labor scheme accomplished through lopsided employment contracts, travel

because it tended to show Curley was more violent and disturbed than he appeared from the other evidence." *Id.*

20

restraints, restrictive living conditions, threats of financial ruin, and other vague threats. The pre-indictment evidence from 2001 and 2002, on the other hand, conveys a grimmer narrative—a forced-labor scheme perpetrated through force, violence, evictions of workers' families from their homes, and threats of physical injury. [8] The government might have better connected the narratives if it demonstrated—as it promised the district court it would—that Zhong was personally involved with these specific acts, but the government did not do so. The testimony the government offered established only that some of Zhong's family members participated in these events. While the government claims that its evidence demonstrated that Zhong was "a principal" in Rilin's U.S. operations at the time, the evidence it marshals does not connect Zhong personally to the actions described by the government's witnesses.

Our precedents demand that "[w]hen 'other act' evidence is offered to show knowledge or intent"—or, by extension, planning— that "evidence must be 'sufficiently similar to the conduct at issue' to permit the jury to draw a reasonable inference of knowledge or intent from the other act." *Cadet*, 664 F.3d at 32. Yet the conduct that the government proved occurred during the indictment period—the use of allegedly coercive contracts, holding Rilin workers' passports and visas, housing workers in overcrowded conditions with doors that

---

[8] The government attempts to identify similar conduct during the indictment period by arguing that Zhong and Rilin attempted to "abduct" a Rilin worker, Kai Kang, after he left in 2010. Gov't Br. 17-18, 36-39. The evidence at trial, however, did not establish an abduction attempt. The only evidence the government cites is testimony that (1) Zhong asked a Rilin employee if he knew Kang had escaped and where he was and (2) a witness heard that other Rilin employees were looking for Kang.

21

lock from the outside, and threatening one family with a financial penalty—is not sufficiently similar to the violent and threatening actions that occurred in 2001 and 2002 such that it would be reasonable for a jury to infer that Zhong knew, intended, or planned to maintain the same course of conduct suggested by the pre-indictment actions.

Even if the evidence from 2001 and 2002 completed the story of the crimes charged against Zhong, we would nevertheless conclude that the district court abused its discretion in admitting that evidence. We have approved the admission of evidence of uncharged crimes when the uncharged crimes "did not involve conduct more inflammatory than the charged crime." *United States v. Paulino*, 445 F.3d 211, 223 (2d Cir. 2006) (quoting *United States v. Livoti*, 196 F.3d 322, 326 (2d Cir. 1999)); *see also United States v. Reichberg*, 5 F.4th 233, 242 (2d Cir. 2021) (holding that the district court did not abuse its discretion to admit evidence of uncharged conduct because, *inter alia*, that evidence "was no more inflammatory than the facts of the charged scheme"); *United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990) (holding that prior act evidence was not unfairly prejudicial because it "did not involve conduct any more sensational or disturbing than the crimes … charged"). Here, by contrast, the evidence of uncharged crimes described conduct that was "significantly more sensational and disturbing than the charged crimes," *Curley*, 639 F.3d at 62, and could "lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged," *Paulino*, 445 F.3d at 223 (quoting *Old Chief v. United States*, 519 U.S. 172, 180 (1997)). Under these circumstances, Rule 403 required the district court to exclude the evidence from before the

22

indictment period and the district court abused its discretion in failing to do so.[9]

**B**

Next, Zhong contends that the district court erred by preventing his efforts to impeach Ken Wang by offering testimony regarding Wang's reputation for truthfulness. We agree. Rule 608 allows a party to "attack[]" a "witness's credibility" with "testimony about the witness's reputation for having a character for truthfulness or untruthfulness, or by testimony in the form of an opinion about that character." Fed. R. Evid. 608(a). Yet when Zhong attempted to ask two witnesses about Wang's reputation for truthfulness, the district court sustained the government's objections and did not allow Zhong to elicit such testimony.

These rulings were erroneous. One portion of the trial transcript suggests that the district court disallowed this evidence because it was hearsay. *See* App'x 225. But reputation evidence "must be based on hearsay," *United States v. Lynch*, 366 F.2d 829, 832 (3d Cir. 1966), and Rule 803 clarifies that testimony regarding "[a] reputation

---

[9] Additionally, the pre-indictment evidence related to actions for which Zhong may have possessed diplomatic immunity. *See supra* note 5. On appeal, neither party challenges the district court's conclusion that Zhong is entitled to residual immunity. While there is no per se bar on the use of immune behavior in completing the story—or proving a defendant's knowledge, intent, or planning—of charged non-immune conduct, the fact that the district court held Zhong possessed immunity with respect to the pre-indictment behavior reinforces the conclusion that it was inappropriate to admit evidence of that behavior to establish the criminality of his later conduct. The jury might have convicted Zhong based on actions for which he was immune.

23

among a person's associates or in the community concerning the person's character" is "not excluded by the rule against hearsay," Fed. R. Evid. 803(21); *see also Michelson v. United States*, 335 U.S. 469, 477 (1948) ("When the defendant elects to initiate a character inquiry … [n]ot only is he permitted to call witnesses to testify from hearsay, but indeed such a witness is not allowed to base his testimony on anything but hearsay."). On appeal, the government does not argue otherwise.

The government attempts to defend these decisions on two alternative grounds, but neither is persuasive. First, the government argues that Zhong's witnesses lacked personal knowledge of Wang's reputation for truthfulness. *See* Fed. R. Evid. 602. One witness whom Zhong asked about Wang's reputation, however, worked directly under Wang's direction at Rilin, and Zhong's other witness worked at Rilin at the same time as Wang for multiple years. *See United States v. Mandel*, 591 F.2d 1347, 1370 (4th Cir. 1979) (explaining that the workplace is "a proper locality in which to prove [a witness's] reputation or character for truthfulness or untruthfulness"). Second, the government argues that the district court properly excluded this reputation testimony because it was cumulative of other evidence Zhong presented to impeach Wang. Yet the government does not identify any other evidence that Zhong presented to show that Wang had a reputation for untruthfulness.

Zhong also sought to impeach Wang by cross-examining him about an alleged adverse credibility determination that a New Jersey court made against Wang during a hearing on Wang's application for a firearms permit. *See* Fed. R. Evid. 608(b) (providing that "the court may, on cross-examination," allow "specific instances of a witness's conduct" to be "inquired into if they are probative of the character for

truthfulness or untruthfulness" of the witness). The district court did not allow that line of inquiry and, contrary to Zhong's arguments on appeal, the district court did not abuse its discretion in doing so. The New Jersey court's finding concerned Wang's temperament rather than his character for truthfulness, and it occurred during a firearms hearing—not in a proceeding relevant to the content of Wang's testimony in Zhong's case. Even if the New Jersey court's decision to some extent called into question whether Wang accurately portrayed his own temperament, under these circumstances, the district court did not abuse its discretion in concluding that the decision was not sufficiently probative of Wang's character for truthfulness to justify permitting Zhong to cross-examine Wang about it. *See United States v. White*, 692 F.3d 235, 249 (2d Cir. 2012) (identifying "seven non-exhaustive factors for courts to consider in determining the probity and relevance of a prior incident in which a court has criticized a witness's testimony as unworthy of belief").

## C

Zhong additionally challenges Luis DeBaca's expert testimony. Under Rule 702, an expert may testify if, *inter alia*, his or her "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). "For an expert's testimony to be admissible under this Rule, however, it must be directed to matters within the witness'[s] scientific, technical, or specialized knowledge and not to lay matters which a jury is capable of understanding and deciding without the expert's help." *Andrews v. Metro N. Commuter R. Co.*, 882 F.2d 705, 708 (2d Cir. 1989); *see also* Fed. R. Evid. 702 advisory committee's note to 1972 proposed rules (noting that the use of expert testimony is improper when "the untrained layman would be

qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute"). Therefore, "[a] district court may commit manifest error by admitting expert testimony where … the subject matter of the expert's testimony is not beyond the ken of the average juror." *United States v. Amuso*, 21 F.3d 1251, 1263 (2d Cir. 1994).

Zhong argues that the issue before the jury for the forced-labor charges—whether Zhong "obtain[ed] the labor or services" of Rilin workers through actual or threatened force, physical restraint, or other serious harm sufficient "to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm," 18 U.S.C. § 1589(a), (c)(2)—was simple. Normally, Zhong says, such activity would be proved with testimony from the alleged victims. Those victims would testify about Rilin's actions and the effect those actions had on them—and that testimony would allow the jury to conclude whether those actions rendered Rilin liable under the forced-labor statute. But in this case, Zhong argues, the government improperly used DeBaca's "expert" testimony about forced-labor practices to compensate for its lack of victim witnesses from the indictment period.[10]

Insofar as Zhong argues that forced labor is categorically an improper subject for expert testimony, we disagree. As DeBaca's testimony illustrates, forced-labor enterprises, especially those involving foreign workers, may involve complex activities that jurors

---

[10] *See supra* note 4.

would not readily understand as aspects of a forced-labor scheme. For example, perpetrators of forced labor may encumber workers by involving them in crimes, making the workers less likely to seek help and more likely to fear the consequences of leaving their company's employ. Additionally, certain victims may be treated preferentially in a manner that may appear inconsistent with forced labor, and forced-labor organizations may also grant workers certain communication or vacation privileges that might appear inconsistent with forced-labor practices. In such cases, expert testimony may assist jurors in putting these practices in perspective when they otherwise would have difficulty doing so.[11]

While the district court therefore did not err in allowing the government to call DeBaca to testify, it still had a duty to ensure that DeBaca's testimony did not exceed its proper scope. Expert witnesses may not "usurp[] the jury's function" by "providing an overall conclusion of criminal conduct." *Dukagjini*, 326 F.3d at 54. It is important to distinguish "the legitimate use of an … expert … to explicate an organization's … structure" from "the illegitimate and

---

[11] Decisions from other circuit courts further support the conclusion that forced-labor prosecutions may involve issues that lie "beyond the ken of the average juror." *Amuso*, 21 F.3d at 1263; *see United States v. Farrell*, 563 F.3d 364, 377 (8th Cir. 2009) (holding, in a case in which the defendant was charged with peonage, that an expert's testimony was "relevant insofar as it provided this broader context for the jury to understand the workers' actions, to understand the conditions in which they may have labored, and to assess the truthfulness of their allegations"); *see also United States v. Brinson*, 772 F.3d 1314, 1319 (10th Cir. 2014) (holding, in a case in which the defendant was charged with trafficking in child prostitution, that an expert's testimony "could have helped the jury" better understand, *inter alia*, "the relationship between pimps and their prostitutes, … how pimps recruit prostitutes, and how pimps control prostitutes").

impermissible substitution of expert opinion for factual evidence." *United States v. Mejia*, 545 F.3d 179, 190 (2d Cir. 2008). Likewise, the government may not use expert testimony to "provide [itself] with an additional summation by having the expert interpret the evidence." *Dukagjini*, 326 F.3d at 54 (alterations omitted). In light of these limitations on expert testimony, district courts must proceed with caution.[12]

In this case, DeBaca not only explained the inner workings of forced-labor operations in general; he also provided a detailed analysis of the employment contract Rilin used, App'x 372-88, commenting that one clause was "troubling" and another raised "major red flags," App'x 375-76, 384. Having already heard DeBaca's expert explanations regarding forced-labor schemes in general, the jury did not need his analysis of the Rilin contract in order to determine whether that contract was sufficiently coercive to cause Zhong to violate the forced-labor statute. The jury had no legitimate use for DeBaca's color commentary about its "troubling" and "red

---

[12] *Dukagjini* and *Mejia* each involved challenges to the admissibility of the testimony of a government investigator serving as an expert witness. We explained that, under those circumstances, "there is an *increased danger* that the expert testimony will stray from applying reliable methodology and convey to the jury the witness's 'sweeping conclusions' about [the defendant's] activities." *Dukagjini*, 326 F.3d at 54 (emphasis added); *see also Mejia*, 545 F.3d at 191 ("[I]t is a little too convenient that the Government has found an individual who is expert on precisely those facts that the Government must prove to secure a guilty verdict—*even more so when that expert happens to be one of the Government's own investigators.*") (emphasis added). DeBaca was not an investigator in this case and might not have presented a similarly increased danger. Nevertheless, the district court was still required to ensure that DeBaca did not "interpret the evidence" and "usurp[] the jury's function." *Dukagjini*, 326 F.3d at 54.

flag[]"-raising provisions. App'x 375-76, 384. The government seems to have impermissibly used DeBaca's testimony to "interpret" and "vouch for the admissible evidence [it had] offered." *Dukagjini*, 326 F.3d at 54. With this testimony, moreover, DeBaca came "dangerously close to usurping the jury's function" by "providing an overall conclusion of criminal conduct." *Id.*

Most importantly, portions of DeBaca's testimony severely prejudiced Zhong. Those portions bore, at best, tangential relevance to his case. DeBaca did not limit his testimony to explaining the details of forced-labor operations in general and the facts of Zhong's case. He specifically discussed the motivations for such organizations and China's human rights record with respect to forced labor. At one point, DeBaca said that people employ forced labor due to a "combination of profit maximization [objectives] on the one hand, and almost a pleasure that is taken in being able to have this type of control over other people." App'x 328-29. He discussed the history of slavery and sharecropping in the United States as providing background for his opinions. App'x 311-12, 337, 346. After the government "turn[ed his] focus to forced labor issues specific to or particularly problematic in China," App'x 361, DeBaca highlighted China's poor record with respect to forced labor. He testified that "Chinese labor trafficking" was a "routine problem" that "cropp[ed] up" "all over the world." App'x 364. He spoke about how Chinese businessmen would "scoop[] up" "mentally" and "physically" challenged" people who were "begging" "in railway stations" and "take[] [them] out to brick kilns … or to other very dangerous and

29

dirty jobs." App'x 363. [13] DeBaca also discussed China's use of "reeducation through labor camps, large prison systems set up ... for the Muslim community from the Uighur subgroup." App'x 366-67. Finally, he reported that the U.S. government's annual human-trafficking reports rated China among the world's most problematic countries. App'x 367-69.

Much of this evidence is hardly relevant to Zhong's case. *See* Fed. R. Evid. 401 ("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."). For example, there was no evidence that Rilin workers were mentally or physically challenged or that they were members of religious minority groups in China.

Yet even if some of the testimony might have been relevant, as the government argues, to enable the jury to understand "the unique social, political and economic factors that can render Chinese workers initially susceptible to joining a forced labor scheme and to fear leaving the scheme," Gov't Br. 57, the testimony improperly risked prejudicing the jury against Zhong, a Chinese man who was associated with the Chinese government. We have held that an expert may not "[i]nject[] ... a defendant's ethnicity into a trial as evidence of criminal behavior" because such testimony "is self-evidently improper and prejudicial." *United States v. Cruz*, 981 F.2d 659, 664 (2d Cir. 1992); *see also Jinro Am. Inc. v. Secure Investments, Inc.*, 266 F.3d 993, 1007 (9th Cir. 2001) (holding that the district court erred in "[a]llowing an expert witness in a civil action" brought against a Korean business

---

[13] At this point, the district court told DeBaca that he went a "[l]ittle too far," but it did not act to limit the prejudicial effect of this testimony. App'x 363.

"to generalize that most Korean businesses are corrupt, are not to be trusted and will engage in complicated business transactions to evade Korean currency laws").

The government also may not invite the jury to find guilt based on a defendant's associations. *See Cruz*, 981 F.2d at 663 ("[G]uilt may not be inferred from the conduct of unrelated persons."); *United States v. Castillo*, 924 F.2d 1227, 1231 (2d Cir. 1991) (suggesting that "expert testimony was employed not for the permissible purpose of assisting the jury to understand the facts at issue, but rather for the impermissible purpose of encouraging the inference of appellants' guilt from the behavior of unrelated persons"); *see also United States v. Lopez-Medina*, 461 F.3d 724, 741-42 (6th Cir. 2006) ("Evidence that demonstrates only 'guilt by association' … is irrelevant to the question of a defendant's actual guilt."); *United States v. Polasek*, 162 F.3d 878, 884 n.2 (5th Cir. 1998) (citing cases). The prejudicial nature of this testimony is further heightened by the fact that the government questioned DeBaca about the Rilin employment contract immediately following the general testimony about forced labor in China. *See* App'x 369-70. This testimony, therefore, improperly invited the jury to find Zhong guilty by association and the district court should have excluded it under Rule 403.

### D

Having concluded that the district court made erroneous evidentiary rulings, we now address whether those errors warrant vacating Zhong's convictions. Even if a district court errs, a defendant ordinarily is not entitled to a new trial if those errors were "harmless—i.e., … unimportant in relation to everything else the jury considered on the issue in question." *Cameron v. City of New York*, 598

F.3d 50, 61 (2d Cir. 2010).[14] We may hold that an evidentiary error is harmless only "if we can conclude with fair assurance" that the wrongly excluded or admitted evidence would not have or "did not substantially influence the jury." *Id.* at 61 (internal quotation marks omitted); *see also Kotteakos v. United States*, 328 U.S. 750, 765 (1946) ("[I]f one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected ... [and] the conviction cannot stand."). In applying that standard, we consider "(1) the overall strength of the prosecution's case; (2) the prosecutor's conduct with respect to the improperly admitted evidence; (3) the importance of the wrongly admitted evidence; and (4) whether such evidence was cumulative of other properly admitted evidence." *Al-Moayad*, 545 F.3d at 164. Additionally, "the cumulative effect of a trial court's errors, even if they are harmless when considered singly, may ... requir[e] reversal" or vacatur of a conviction. *Id.* at 178. The government bears the burden of proving

---

[14] Because Zhong properly preserved his objections to the evidentiary errors, we review those errors for harmless error rather than plain error. Zhong objected to the admission of the pre-indictment evidence and to DeBaca's testimony. The government objected to the admission of evidence regarding Ken Wang's reputation for truthfulness. While Zhong did not respond to that objection with an offer of proof, "an offer of proof is not an absolute prerequisite in every appeal from the exclusion of evidence" and is required only where "the significance of the excluded evidence is not obvious or where it is not clear what the testimony of the witness would have been." *Henry v. Wyeth Pharms., Inc.*, 616 F.3d 134, 151-52 (2d Cir. 2010) (internal quotation marks omitted). Here, the significance and substance of the excluded evidence is clear.

the error was harmless. *United States v. Kaiser*, 609 F.3d 556, 573 (2d Cir. 2010).

In this case, "we cannot conclude with fair assurance" that "the cumulative effect of" the district court's erroneous evidentiary rulings "did not substantially influence the jury" in its decision to convict Zhong of the three forced-labor charges. *Al-Moayad*, 545 F.3d at 169, 178 (internal quotation marks omitted). The testimony about the events of 2001 and 2002 formed a central component of the government's case. In fact, the story of one 2001 abduction was "quite literally the first thing mentioned in the government's opening statement." *United States v. Stewart*, 907 F.3d 677, 689 (2d Cir. 2018) (holding that such use of inadmissible evidence undermines any argument that its admission was harmless); *see* App'x 124. The government mentioned these events multiple times in its opening and its closing and told the jury on multiple occasions that Zhong himself was personally responsible for ordering these actions. Furthermore, if Zhong had been able to impeach Wang with reputation testimony, the jury might have had trouble connecting Zhong with the violence that occurred in 2001 and 2002. No other government witness testified that Zhong participated in or knew about actions like those described as having occurred in that period. Finally, the prejudicial portions of DeBaca's testimony likely tainted the jury's assessment of the forced-labor-related evidence the government presented from the indictment period. Accordingly, we vacate Zhong's convictions for forced labor, forced-labor conspiracy, and document servitude in connection with forced labor.

We reach a different conclusion, however, with respect to Zhong's alien smuggling and visa conspiracy convictions. The prejudicial effect of the district court's evidentiary errors was to lead

the jury to believe that Zhong was more violent and coercive than the evidence would have otherwise shown him to be. The government offered the pre-indictment evidence to show that Zhong participated in ruthless reprisals against escaped Rilin workers. Wang's testimony—which may have appeared more credible than it should have—reinforced the government's portrayal of Zhong as a cruel leader. DeBaca's expertise framed Zhong's actions as consistent with the brutal activities of recognized perpetrators of forced labor, past and present. Yet Zhong's allegedly coercive tendencies had little relevance to the government's alien smuggling and visa conspiracy prosecutions. To convict Zhong of those counts, the jury merely had to find, respectively, that Zhong conspired to transport aliens "in furtherance" of their illegal presence in the United States, 8 U.S.C. § 1324(a)(1), and that he conspired to utter, use, attempt to use, possess, obtain, accept, or receive a fraudulent visa, *see* 18 U.S.C. §§ 371, 1546(a). Zhong could have committed these crimes without engaging in violence. The district court's erroneous evidentiary decisions therefore do not seriously impugn Zhong's alien smuggling and visa fraud convictions.[15]

---

[15] Zhong argues that DeBaca provided a legally erroneous definition of "alien smuggling," in that his definition omitted the statute's "in furtherance" requirement. *See* App'x 330-31. The district court sufficiently ameliorated any harm this might have caused, however, when it instructed the jurors that they "would violate [their] oaths as jurors if [they] based [their] verdict on anything other than the law as I define it," Gov't App'x 527-28, and took care to explain the statute's "in furtherance" requirement, *see* App'x 923-924, 926.

## III

With Zhong's evidentiary objections resolved, we address his sufficiency-of-the-evidence claims. "We review de novo challenges to the sufficiency of the evidence," viewing "the evidence in the light most favorable to the government, drawing all inferences in the government's favor and deferring to the jury's assessments of the witnesses' credibility." *United States v. Sabhnani*, 599 F.3d 215, 241 (2d Cir. 2010). In undertaking this review, we "consider the government's case in its totality rather than in its parts," mindful that the sufficiency-of-the-evidence test may be "satisfied by circumstantial evidence alone." *United States v. Hawkins*, 547 F.3d 66, 70-71 (2d Cir. 2008) (alteration omitted). A defendant, moreover, cannot prevail on a sufficiency-of-the-evidence challenge "if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Kozeny*, 667 F.3d 122, 139 (2d Cir. 2011) (internal quotation marks omitted).

Zhong argues that the government did not present sufficient admissible evidence to allow a reasonable jury to convict him of either the forced-labor or the alien smuggling charges and that we therefore must reverse the district court's decision to deny Zhong's motion for an acquittal. We disagree.

## A

To convict Zhong of the forced-labor charges, the jury needed to conclude that, through Rilin's actions, Zhong "knowingly provide[d] or obtain[ed] the labor or services" of Rilin workers through one or more of the methods prohibited by the forced-labor statute. 18 U.S.C. § 1589(a). The method that fits Zhong's alleged conduct is to obtain labor "by means of serious harm or threats of

35

serious harm." *Id.* § 1589(a)(2). The statute defines "serious harm" to "mean[] any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." *Id.* § 1589(c)(2). Therefore, in order to secure a conviction on the forced-labor counts, the government needed to produce admissible evidence that could reasonably show that Zhong "knowingly or intentionally engaged in [harmful] actions or made threats [of harm] that were sufficiently serious to compel a reasonable person in [the Rilin workers'] position to remain in [Rilin's] employ, against [their] will and in order to avoid such threats of harm, when [they] otherwise would have left." *Muchira*, 850 F.3d at 620. Moreover, the evidence would need to demonstrate that such actions or threats did, in fact, compel the Rilin workers to remain working for Rilin when they otherwise would have left. Otherwise, Zhong could not have "provide[d] or obtain[ed]" their labor though these actions or threats. 18 U.S.C. § 1589(a).

Even without the erroneously admitted material, the government's evidence would allow a reasonable jury to come to those conclusions. That evidence showed that (1) Rilin workers had to tender a large security deposit before they could join the company; (2) even though Rilin workers' wages are higher than one would expect from domestic construction work, Rilin workers' families received only a small portion of that income while the workers were in the United States, and Rilin paid the bulk of that income only upon the workers' return; (3) Rilin had the authority to decide when a worker's tour of duty ended; (4) Rilin imposed rules limiting its

36

workers' freedom of movement and their freedom to contact people, especially local Chinese-speaking communities; (5) if workers did not follow the rules or fled, Rilin could saddle them with a host of incidental costs or force them to forfeit all their unpaid wages and their security deposits; (6) on one occasion, Rilin brought the family of an escaped employee to court in China, obtained a judgment against them, and told them they owed 1 million RMB; (7) until 2011, Rilin employees were housed in residences that locked from the outside; (8) Rilin held its workers' passports and visas while they were in the United States and kept a list of escaped workers; and (9) Zhong led and was intimately involved with Rilin's U.S. operations.

Based on this evidence, a "rational trier of fact could have found," *Kozeny*, 667 F.3d at 139, that Zhong knowingly or intentionally visited harm on Rilin workers or threatened them with harm in a manner "sufficiently serious to compel a reasonable person in [the Rilin workers'] position to remain in [Rilin's] employ, against [their] will and in order to avoid such threats of harm, when [they] otherwise would have left," *Muchira*, 850 F.3d at 620 (emphasis omitted). And a jury could further conclude that Zhong's actions did, in fact, compel Rilin workers to remain working for Rilin when they otherwise would have left, and Zhong thus "obtain[ed] the[ir] labor or services" in violation of the forced-labor statute. 18 U.S.C. § 1589(a).

Zhong protests that a reasonable jury could not so conclude unless it heard testimony from Rilin workers that Zhong's actions compelled them to work for Rilin against their will. The government

37

did not present such testimony.[16] In effect, Zhong argues that the government needed to provide direct evidence of Zhong's successful forced-labor scheme. Our precedents, however, do not impose such a requirement. The sufficiency-of-the-evidence test may be "satisfied by circumstantial evidence alone." *Hawkins*, 547 F.3d at 70-71. Accordingly, the district court did not err in denying Zhong's motion for acquittal, and the government may retry him on the forced-labor charges.

### B

As for the alien smuggling count, the government charged Zhong with conspiring to violate 8 U.S.C. § 1324(a)(1)(A)(ii), which imposes criminal liability on any person who, "knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, transports, or moves or attempts to transport or move such alien within the United States by means of transportation or otherwise, in furtherance of such violation of law." Therefore, to convict Zhong on this count, the jury needed to find that Zhong conspired to transport Rilin workers in the United States "in furtherance of" their unlawful presence in the United States. *See United States v. Stonefish*, 402 F.3d 691, 695 (6th Cir. 2005) ("The 'violation of law' to which the provision refers is the illegal alien's continued illegal presence in the United States."). The government's key piece of evidence in this regard was Rilin's transportation of its workers from their residences to construction projects that laid outside the scope of their visas. Because individuals who violate the terms of their visas are subject to removal, *see* 8 U.S.C. § 1227(a)(1)(C)(i), the government argued that Rilin's transportation

---

[16] *See supra* note 4.

of its workers furthered their illegal presence in the United States by allowing them to avoid detection by local authorities and to continue to remain in the United States in violation of the conditions of their visas.

The alien smuggling statute's "in furtherance" element requires that—to give rise to liability under the statute—the transportation at issue must "help, advance, or promote the alien's illegal entry or continued illegal presence in the United States." *United States v. Barajas-Chavez*, 162 F.3d 1285, 1288 (10th Cir. 1999); *see also Furtherance*, Black's Law Dictionary (11th ed. 2019) (defining "furtherance" as "[t]he act or process of facilitating the progress of something or of making it more likely to occur; promotion or advancement"). On this understanding, transporting illegal aliens to work and back does not qualify as alien smuggling unless the transportation helped the illegal alien to maintain his illegal presence.

Our sister circuits have variously described what additional showing the in-furtherance element requires. Some require that the transportation have a "direct or substantial" (as opposed to an "incidental") relationship to maintaining the alien's illegal presence. *United States v. Moreno*, 561 F.2d 1321, 1323 (9th Cir. 1977); *see also United States v. Velasquez-Cruz*, 929 F.2d 420, 422-23 (8th Cir. 1991) (adopting *Moreno* as the "[p]roper [t]est" for applying the in-furtherance element). Others have adopted an intent-based requirement pursuant to which a defendant must "transport[] the illegal aliens *for the purpose of* furthering their illegal presence in the United States." *Stonefish*, 402 F.3d at 699 (emphasis added). Still others articulate less demanding intent-based variations of these approaches, *see Barajas-Chavez*, 162 F.3d at 1288 ("The statute requires that a defendant know or act in reckless disregard of the fact that an

individual is an illegal alien, and that defendant's transportation or movement of the alien will help, advance, or promote the alien's illegal entry or continued illegal presence in the United States."); *United States v. Parmelee*, 42 F.3d 387, 391 (7th Cir. 1994) ("[T]he defendants had to know not only that the … aliens had entered this country illegally, but also that they were furthering the aliens' illegal entry by transporting them."); *United States v. Merkt*, 764 F.2d 266, 272 (5th Cir. 1985).

Our court has yet to take a position on this issue, and we need not do so here. In this case, the government's evidence was sufficient to allow the jury to convict Zhong of the alien smuggling charge under any of these approaches. The government presented evidence of the lengths to which Rilin would go to limit the contact its workers would have with members of the community and how it policed the outside contact that might occur. Rilin and Zhong purposefully housed Rilin employees away from local Chinese communities and instructed the employees not to speak with local Chinese speakers. House rules required that workers not venture out alone, report their destinations when they went out as a group, and refrain from participating in large public events. And at least until 2011, Rilin housed workers in facilities that locked from the outside. As the government explains, a jury could have concluded from this evidence that Zhong led an "effort to conceal and isolate the workers from social contact" at least in part to "limit[] the opportunities for others to speak to them and learn" about their circumstances, which might lead to actions that would disturb Rilin's operation. Gov't Br. 85. Furthermore, the jury could have reasonably concluded that Rilin's decision to transport its workers directly to and from the unapproved worksites formed "an integral part of the bubble that Zhong and his

coconspirators constructed around the workers" in that it "prevent[ed] contact with law enforcement authorities who might" have otherwise uncovered that these workers were illegally present in the United States. Gov't Br. 87.

Zhong argues that other evidence demonstrates that he did not seek to shield Rilin workers from public view and that Rilin's transportation of workers could not have been part of any effort to ensure they avoided detection. Specifically, Zhong points to the facts that Rilin workers sometimes mingled with their neighbors, toured the country, and, when they were at the illegal worksites, worked openly, wore Rilin jackets, and attended OSHA trainings. While this evidence might point in the other direction, it did not require the jury to acquit Zhong on the alien smuggling charge. A "rational trier of fact could have found," *Kozeny*, 667 F.3d at 139, that Rilin did not conceal its workers entirely but that controlling the workers' transportation to and from the worksites was still part of the effort to limit the workers' exposure. The jury might have concluded, for example, that Rilin did not conceal the workers under every circumstance for fear of raising suspicion or for other prudential considerations, but it nevertheless did so under these circumstances. Because a rational juror could have concluded that the transportation was in furtherance of the workers' illegal presence, the district court did not err in denying Zhong's motion for acquittal on the alien smuggling conspiracy charge. Because we have determined that the district court's evidentiary errors had little—if any—impact on the jury's decision to convict Zhong on that count, we affirm that conviction.

41

# IV

Finally, we address Zhong's sentence. The district court imposed a 190-month term of imprisonment for Zhong's forced-labor and forced-labor-conspiracy convictions. Our decision to vacate those convictions extinguishes that sentence. The district court imposed a sixty-month term of imprisonment—or perhaps two concurrent sixty-month terms, the judgment is unclear, *see* App'x 1514—for Zhong's convictions for document servitude in connection with forced labor and for visa fraud conspiracy, to run concurrently with his other sentences. Our decision to vacate the document servitude conviction requires us to vacate the sixty-month sentence and remand Zhong's visa fraud conspiracy conviction for resentencing. Finally, the district court imposed a concurrent sentence with a 108-month term of imprisonment for Zhong's alien smuggling conviction, which we have affirmed. Finding no procedural unreasonableness with this sentence, we affirm.[17]

_____

[17] Zhong also brings a substantive reasonableness challenge, but his arguments relate only to his forced-labor sentence. Regardless, we find those arguments meritless. Zhong argues that his sentence for those convictions was substantively unreasonable because the sentence failed to "avoid unwarranted disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Zhong notes that his 190-month sentence was far longer than three other sentences our court has affirmed in forced-labor cases, two of which involved more egregious conduct than that in which Zhong was found to have engaged. *See Sabhnani*, 599 F.3d at 225-30, 250 (132-month sentence for a defendant who sadistically tortured domestic servants over five years); *United States v. Marcus*, 517 F. App'x 8, 10-11 (2d Cir. 2013) (ninety-six-month sentence for a defendant who subjected his victim to "physical and psychological torture" that caused "lasting physical and mental injury");

"Procedural error occurs in situations where, for instance, the district court miscalculates the Guidelines; treats them as mandatory; does not adequately explain the sentence imposed; does not properly consider the § 3553(a) factors; bases its sentence on clearly erroneous facts; or deviates from the Guidelines without explanation." *United States v. McIntosh*, 753 F.3d 388, 394 (2d Cir. 2014). "[W]e presume that a sentencing judge has faithfully discharged her duty to consider the statutory factors," *United States v. Verkhoglyad*, 516 F.3d 122, 129 (2d Cir. 2008) (internal quotation marks omitted), and "we do not require 'robotic incantations' that the district court has considered each of the § 3553(a) factors," *United States v. Cavera*, 550 F.3d 180, 193 (2d Cir. 2008) (en banc). Moreover, "we never have required a District Court to make specific responses to points argued by counsel in connection with sentencing." *United States v. Bonilla*, 618 F.3d 102, 111 (2d Cir. 2010). At the same time, "just as we do not insist upon 'robotic incantations,' we require more than a few magic words," and "[w]here the appellant or prosecutor presents nonfrivolous reasons for imposing a different sentence the judge will normally go further and explain why he has rejected those arguments." *United States v. Corsey*, 723 F.3d 366, 376-77 (2d Cir. 2013) (alteration omitted).

---

*United States v. Garcia*, 164 F. App'x 176, 177 (2d Cir. 2006) (forty-six-month sentence for a defendant who recruited migrant farm workers near the Mexico border and forced them to work until they had paid off debts). As the government points out, however, these cases are not necessarily comparable to Zhong's because either the cases involved far fewer victims or the sentences resulted from a Guidelines range on which the government and the defendant agreed before sentencing. *Sabhnani*, 599 F.3d at 224-25 (two victims); *Marcus*, 517 F. App'x at 11 (one victim); Plea Agreement at 7, *United States v. Garcia*, No. 1:02-CR-110 (W.D.N.Y. Dec. 2, 2004), ECF No. 248 (agreed-upon Guidelines sentence).

Zhong argues that the district court improperly applied a "vulnerable victims" enhancement to the Guidelines offense level. U.S.S.G. § 3A1.1(b).[18] Zhong contends that the district court failed to make "individualized findings as to the vulnerability of particular victims" and instead relied on "broad generalizations about victims based upon their membership in a class." *United States v. McCall*, 174 F.3d 47, 50 (2d Cir. 1998). The concern we expressed in *McCall* about "broad generalizations," however, applies specifically "where a very substantial portion of the class is not in fact particularly vulnerable to the crime in question." *Id.* In this case, the class of alleged victims consisted of Chinese nationals with little means, education, and English proficiency. The district court committed no procedural error in concluding that such individuals are "unusually vulnerable" or "particularly susceptible" to becoming victims of an alien smuggling scheme in which workers are brought to the United States and isolated from local Chinese-speaking communities. U.S.S.G. § 3A1.1 application note 2; *see* App'x 940; *see also United States v. Getto*, 586 F. App'x 11, 13-15 (2d Cir. 2014) (holding that the enhancement properly applied to defendants convicted of operating a fraudulent telemarketing scheme that targeted "older people" and those "who had problems of one sort or another in the reasoning world" such as people who "suffered from dementia").

Before the district court, Zhong requested that his sentence be reduced because of the conditions of his pretrial confinement at MDC-Brooklyn. We have recognized that the "severity of the conditions of

---

[18] Zhong makes this argument with reference to his forced-labor sentence. The district court, however, also applied this enhancement to his alien smuggling conviction. We therefore address this argument here.

confinement" is a "not unreasonable" basis for a court to impose a shorter sentence than might otherwise be warranted. *United States v. Stewart*, 590 F.3d 93, 144 (2d Cir. 2009). The district court responded to Zhong's argument by saying that it was "struck as [it] listened to counsel list the conditions of Mr. Zhong's confinement—unsafe, unhealthy, isolated, not speaking the language. How easily those arguments could be applied to the victims in this case." App'x 962.

Zhong argues that the district court improperly failed to "go further and explain why [it] … rejected" this "nonfrivolous reason[] for imposing a different sentence." *Corsey*, 723 F.3d at 377. Even assuming the argument was "nonfrivolous" and merited a response, the district court explained why it rejected the argument when it said the argument was hypocritical. Regardless, our recognition that the "severity of the conditions of confinement" is a "not unreasonable" basis for a shorter sentence, *Stewart*, 590 F.3d at 144, does not mean a district court must impose a lower sentence in such a scenario.

Zhong also argues that the district court failed "to adequately explain the chosen sentence." *United States v. Pugh*, 945 F.3d 9, 27 (2d Cir. 2019) (quoting *Gall v. United States*, 552 U.S. 38, 51 (2007)). Zhong is incorrect. The district court reviewed the § 3553(a) factors, said it considered those factors, and then discussed the severity of Zhong's crime and the need to protect the public from possible future crimes Zhong might commit. *See* App'x 960-66. The transcript of the sentencing proceeding sufficiently demonstrates that the district court "considered the parties' arguments" and had a "reasoned basis for exercising its own legal decisionmaking authority." *Cavera*, 550 F.3d at 193 (alteration omitted).

45

Finally, our decision to vacate Zhong's forced-labor convictions does not render his alien smuggling sentence procedurally unreasonable. Zhong's 108-month sentence on that count sat at the low end of the applicable Guidelines range. *See* App'x 934-35 (stating that the offense level applicable to "the alien smuggling conspiracy" count "is ... 31" and placing Zhong's criminal history "in Category I"); U.S.S.G. ch. 5, pt. A, Sentencing Table (recommending a sentence of imprisonment of 108 to 135 months for a defendant in Category I with an offense level of 31). Although the Guidelines offense level the district court calculated for the conviction included a two-level enhancement because the smuggled aliens "were involuntarily detained through coercion or threat," App'x 935; U.S.S.G. § 2L1.1(b)(8)(A), the district court did not rely on Zhong's forced-labor convictions to justify the enhancement.

A district court may apply an enhancement if it concludes—based on its own assessment—that the preponderance of the evidence demonstrates that the enhancement should apply. *See United States v. Ryan*, 806 F.3d 691, 693-94 (2d Cir. 2015); U.S.S.G. § 6A1.3 commentary ("[U]se of a preponderance of the evidence standard is appropriate to meet due process requirements and policy concerns in resolving disputes regarding application of the guidelines to the facts of a case."). That appears to be what occurred here. The presentence report assessed the evidence and concluded that Zhong committed alien smuggling because his conduct involved "involuntarily detain[ing] through coercion or threat" given that "workers were informed that if they tried to escape, or failed to work, or spoke out of turn, their cash collateral deposits agreed upon in their contracts would be seized, as would any property of theirs that was used as collateral as part of their contracts." Presentence Investigation Report

46

("PSR") ¶ 40. The district court concurred with this analysis. *See* App'x 941 ("accept[ing] the presentence report with its addenda in the entirety" with one exception not relevant to the alien smuggling conviction). Moreover, the presentence report based its conclusion on the threatened repercussions included in the Rilin workers' contracts, *see* PSR ¶ 40; App'x 990-92, and Zhong does not contest the admissibility of that evidence. Accordingly, we affirm Zhong's sentence for his alien smuggling conviction.

## CONCLUSION

To summarize, we hold:

1. The district court did not err in failing to give an "adverse but legitimate consequences" jury instruction.

2. The district court erred when it made evidentiary errors including:

   a. allowing the government to present evidence relating to Rilin's violent and threatening activity in 2001 and 2002,

   b. preventing Zhong from introducing evidence regarding Ken Wang's reputation for truthfulness, and

   c. allowing expert Luis DeBaca to interpret the government's evidence and give prejudicial testimony that was largely irrelevant,

   and we cannot conclude that the cumulative effect of those errors was harmless with respect to Zhong's forced-labor convictions. Those errors, however, were harmless with

47

respect to Zhong's alien smuggling and visa fraud convictions.

3. The district court did not err in refusing to allow Zhong to cross-examine Ken Wang about his New Jersey court proceeding or in concluding that forced-labor operations are a proper subject for expert testimony.

4. Even shorn of the erroneously admitted evidence, the government presented sufficient evidence to allow a reasonable jury to convict Zhong of the forced-labor charges.

5. The government presented sufficient evidence to allow a reasonable jury to convict Zhong of the alien smuggling charge.

6. Zhong's sentence for the alien smuggling charge was not unreasonable.

Accordingly, we **VACATE** Zhong's convictions and the associated sentences on the three forced-labor counts: forced labor, forced-labor conspiracy, and document servitude in connection with forced labor, and **REMAND** for a new trial on those counts consistent with this opinion. At that trial, the government may not introduce evidence of Rilin's violent and threatening activity in 2001 and 2002. Furthermore, if the government calls DeBaca to testify, the district court must ensure that DeBaca does not venture into topics inappropriate for expert testimony. Additionally, we **AFFIRM** Zhong's conviction for alien smuggling conspiracy and its associated sentence. Finally, we **AFFIRM** Zhong's visa fraud conspiracy conviction. Because the district court may have imposed a single

sentence on that conviction and the document servitude conviction, however, we **VACATE** that sentence and **REMAND** for resentencing.